**Librado RODRIGUEZ, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 46969.

Court of Criminal Appeals of Texas.

July 17, 1974.

Rehearing Denied Sept. 18, 1974.

Joe Shannon, Jr., Fort Worth, for appellant.

Tim Curry, Dist. Atty., G. D. McManus, L. T. Wilson, R. W. Crampton, Asst. Dist. Atty., Fort Worth, and Jim D. Vollers, State's Atty., Austin, for the State.

OPINION

JACKSON, Commissioner.

This conviction was for murder with malice; the punishment, assessed by the jury, was five (5) years.

Shortly before midnight on New Year's Day of 1970, a fight started in the 820 Bar in the 5400 block of the Mansfield Highway in Tarrant County. Various witnesses estimated there were possibly twenty to thiry persons inside the premises when the fight started. Many persons were injured in the course of the fight which involved stabbings, shootings, broken bottles, wrenches, pool cues and other objects.

The State's evidence showed that the fight started when a waitress at the bar became involved in an argument with appellant, Librado Rodriguez, who is also called "Lee." Appellant pulled out a knife while engaged in this argument with the waitress, or shortly thereafter, and was ordered to leave the bar.

The deceased victim, Paul Eugene Shorten, was the only Negro in the bar, and he had come there as a patron with two white customers, a man and woman.

The victim, Shorten, went up to the bar during the argument between appellant and the waitress, armed with a pistol which was later claimed as the property of his white friends. Several relatives of the appellant were present, and it appears that Shorten shot a cousin of appellant during the fracas. Subsequently, appellant stabbed Shorten several times with a knife, killing him.

Appellant does not contest the sufficiency of the evidence. He testified that he killed Shorten. He was arrested hiding under his father's house immediately after he left the scene.

By his grounds of error numbers one and two, the appellant says that the indictment should have been quashed because Mexican-Americans were systematically excluded from the grand jury which indicted him and from the jury commission which selected the grand jury.

In support of his motion to quash the indictment, appellant presented evidence that in Tarrant County according to the census of 1960 there were 538,495 persons, of which 19,373 had Spanish surnames, which he claimed was proof that they belonged to a class called Mexican-Americans, of which appellant was a member. It was agreed that in 1960 those with Spanish surnames had an educational level of 7.7 years; that some of them possessed the statutory qualifications for service as jury commissioners or grand jurors, but that they had not been asked to serve and would do so if asked; that since 1948, 1104 persons have served as grand jurors in Tarrant County and 355 have served as jury commissioners.

It is further shown by the record that no person on the grand jury which indicted appellant on January 9, 1970, had a Spanish surname, but that such persons had served on grand juries in 1957, 1963, 1967, 1969, and the April term, 1970, and at the October term, 1970. No such person had served on a jury commission to select grand juries in the preceding 20 years.

The population of Tarrant County having Spanish surnames was 3.6 percent of the total population. This does not mean that 3.6 percent of grand jurors must be those with Spanish surnames. The Supreme Court has made it clear that the Constitution does not require proportional representation of races on jury panels. Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). It is required only that the selection be without discrimination as to race.

Appellant failed to establish such racial discrimination. It is here as in Zapata v. State, Tex.Cr.App., 493 S.W.2d 801, where it was said:

"What appellant has failed to show is how many females with Spanish surnames may have married other than Spanish surname males and served on such (grand) juries. Nor does her evidence reflect how many Spanish sur-

name persons were summoned for such duty and requested to be excused because of job requirements or health reasons."

Appellant cites the following cases in support of his contention, all of which are distinguishable from the case under consideration here.

In Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) it was shown that 14 percent of the population in Jackson County had Mexican surnames, yet for the preceding 25 years no such person had served on a jury commission, a grand jury or a petit jury.

In Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, where approximately 10 percent of the county population was Negro, no such person had served on a grand jury or petit jury in the history of the county.

In Sims v. Georgia (1967), 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634, it was shown that 24.4 percent of the county population was Negro, while only 4.7 percent of the names on the list from which grand jurors were drawn were Negro, and 9.8 percent on the petit juror list was Negro. In addition these lists were made up from lists of taxpayers designated by race.

Also, in Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) the grand jurors and petit jurors were selected from lists prepared from tax lists made up on a segregated basis, indicating which were white and which Negro.

In Muniz v. Beto, 434 F.2d 697 (Fifth Circuit 1970), while the population of El Paso County was shown to be 15 to 20 percent or more Mexican-American, over a 10 year period only three percent of grand jurors was of that racial derivation.

All of these situations were held to be indicative of racial discrimination. However, in Tarrant County the percentage of Spanish surname people was only 3.6 percent, the evidence failed to show racial segregation or prejudice, no attack was made on the racial composition of the trial jury which found the appellant guilty, Mexican-Americans had served on grand juries, and no direct evidence was offered showing intentional discrimination.

Appellant was indicted in January 1970. Although there was no person with a Mexican-American surname on that grand jury, there were four grand juries in the county during 1970, a total of 48 jurors, of which two who served had Mexican-American surnames. In 1969, likewise, a total of 48 grand jurors served, of which one had a Mexican-American surname. Combining the two years, a total of 96 jurors served, of which three were with Mexican-American surnames. Without considering the female grand jurors who may have been Mexican-American but married to husbands who did not have Mexican-American surnames, these figures show an almost correct mathematical proportion of Mexican-American surname persons who actually served on grand juries in Tarrant County during the two years covering the period in which the appellant was indicted. Regardless of the facts in previous years, no prima facie case of racial discrimination was shown during the relevant period.

The fact that the jury commission thus produced grand juries not indicating racial discrimination, but to the contrary demonstrated that there was none, sufficiently shows that the jury commissions did not racially. discriminate in the selection of grand jurors to appellant's harm.

We overrule grounds of error numbers one and two.

Ground of error number three advanced by appellant is that the court erred in not granting a mistrial because he says the prosecutor advised the jury that appellant had given a statement to the police different from his testimony at the trial, which statement was not in evidence before the jury.

Appellant in fact had signed a written statement after being warned of his consti-

tutional rights by a Justice of the Peace. The court conducted a hearing as to the voluntary nature thereof in the absence of the jury, then first ruled it to be inadmissible, but later ruled it to be voluntary and in compliance with law and that it could be used only to impeach the witness.

Appellant's counsel agreed to this procedure and made no objection at any time while the prosecuting attorney asked the appellant, line by line, to testify to what he had stated in the written instrument. Some of his testimony corresponded to the written instrument and some varied from it. The jury had not heard the statement read except for the questions. The prosecuting attorney did not show the statement to the jury, except it is reasonable to assume that he held it in his hand while questioning appellant from it. The statement could not be called a confession, but it did relate to some of the surrounding facts.

The ruling of the court may have been based upon Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which held that confessions invalid under *Miranda* may be used for impeachment.

The position taken by defense counsel, that to question the witness for impeachment purposes by the use of the statement was proper, was probably based on *Harris*. This trial was before our opinions in Butler v. State, Tex.Cr.App., 493 S.W.2d 190 and Whiddon v. State, Tex.Cr.App., 492 S.W.2d 566, holding that *Harris* is not to be followed in our courts.

However, when in closing argument the prosecuting attorney said there was a variance between appellant's statement and his testimony, objection was made, "There's no statement been admitted in evidence." The court sustained the objection and instructed the jury to disregard the remarks of counsel, but overruled a motion for mistrial.

■ The action of the trial court was sufficient to render the error harmless, and we overrule ground of error number three. Hunnicutt v. State, Tex.Cr.App., 500 S.W. 2d 806; Hodge v. State, Tex.Cr.App., 488 S.W.2d 779; Haywood v. State, Tex.Cr. App., 482 S.W.2d 855; 56 Tex.Jur.2d, Trial, Sec. 326, p. 687.

In his grounds of error numbers four and five, appellant seeks a reversal because the court over his objection permitted counsel for the State to inform the prospective jurors in voir dire examination that appellant had filed a motion for probation in the event of his conviction. Appellant had filed his motion seeking probation from the jury.

■ We have held it not to be improper to tell the jurors of the motion for probation and to question them as to their attitude on probation, since this is within the scope of punishment which will be considered by the jury in the event of conviction; hence, there is no merit to this contention. Reeves v. State, Tex.Cr.App., 491 S.W.2d 157; White v. State, Tex.Cr.App., 478 S.W.2d 506; Brown v. State, Tex.Cr. App., 475 S.W.2d 938; Houston v. State, Tex.Cr.App., 496 S.W.2d 94.

By ground of error number seven appellant contends the court erred in denying his "motions to discover lists of convictions for felonies or misdemeanors of moral turpitude of various witnesses for the State."

After the State furnished appellant with a list of witnesses it might call, appellant moved pursuant to Article 39.14, Vernon's Ann.C.C.P., to discover the prior criminal records of any of such witnesses. The motions were denied except as to the convictions of the alleged victim Paul Shorten.

It does not appear that the prosecutor had in his possession the criminal records, if any, of the witnesses requested.

At the trial seven of the witnesses whose records, if any, had been requested by the appellant were called by the State. Six of these witnesses were not asked whether they had criminal records. One other witness, Clyde McKnight, was shown on

cross-examination to have given false answers on a federal firearm certificate and to have been convicted of burglary in 1967. All of these witnesses gave descriptions of the barroom brawl which resulted in the death of Shorten which was essentially consistent.

█ Appellant acknowledges the decisions of this Court that required: (1) good cause, (2) materiality, and (3) possession by the State to permit discovery. See Article 39.14, V.A.C.C.P., note #1 and cases there cited. He contends that the possible use of any prior criminal record for impeachment reflected both good cause and materiality.

In Garcia v. State, 454 S.W.2d 400 (Tex.Cr.App.1970), the defendant urged the same contention now advanced. There, this Court wrote:

"Appellant cites no authority for his proposition. No showing was made that the State was in possession of such records or information. At the close of the State's case in chief the District Attorney stated in open court he had no knowledge of any criminal records of the State's witnesses that would be admissible for impeachment or otherwise. We perceive no error."

In Thomas v. State, 482 S.W.2d 218, 219 (Tex.Cr.App.1972), the Court wrote:

"There is no showing that the prosecuting attorney had any 'criminal records' regarding the State's witnesses in his possession. No error is shown by the refusal of such request." Cf. Elliott v. State, 475 S.W.2d 239 (Tex.Cr.App.1972).

█ Appellant recognizes the *Thomas* case, but seeks to distinguish it on the ground that the discovery motion there was directed to the prosecutor [1] and not to "the State" as he did in the instant case. He argues that the language of Article 39.-14, supra, specifically refers to items "in

the possession, custody or control of the State or any of its agencies." He contends that since he directed his motion to the "State" his ground of error cannot be disposed of on the basis of lack of possession of the criminal records, if any, by the prosecuting attorney. Appellant overlooks the fact that there is no showing, even at this late date, that any agency of the State had possession of the same. The contention is overruled.

In ground of error number six appellant further contends that the court erred in refusing to grant an application for attachment for the witness Joel Tisdale, Chief of the Identification Bureau of the Texas Department of Public Safety, after he had been served with a subpoena duces tecum to bring criminal records of certain named witnesses.

In Brito v. State, 459 S.W.2d 834 (Tex. Cr.App.1970), the trial court overruled an application for a juvenile witness previously subpoenaed and served and at the same time overruled the midtrial motion for continuance based on the absence . of the sought after witness. In upholding the conviction there, this Court wrote:

"Normally, a defendant is entitled to an attachment as a matter of right. See Homan v. State, 23 Tex.App. 212, 4 S. W. 575; 61 Tex.Jur.2d, Witnesses; Sec. 14, p. 539. Assuming that this appellant was entitled to an attachment despite the delayed service of the subpoena, we perceive no reversible error, however, since there is no showing made that if the attachment had been issued Ybarra would have testified for the appellant and no showing as to what he would have testified."

█ In *Brito* this Court observed that an accused had the right of compulsory process for obtaining witnesses in his behalf as guaranteed by the Sixth Amendment. See Washington v. Texas, 388 U.S.

---

[1]. It appears from an examination of the records in *Thomas* and *Garcia* that the discovery motions were directed to the "State's Attorney."

14, 87 S.Ct. 1920, 18 L.Ed.2d 1019. However, it was observed that relevancy and materiality of a witness' testimony are the touchstone for determining whether reversible error was committed in denying compulsory process. See Hardin v. State, 471 S.W.2d 60 (Tex.Cr.App.1971). Cf. Hardin v. Estelle, 484 F.2d 944 (5th Cir. 1973).[2]

█ Since there is no showing at any time as to what Tisdale would have testified, we cannot conclude that reversible error is reflected.

We overrule grounds of error six and seven.

The judgment is affirmed.

Opinion approved by the Court.

ODOM and ROBERTS, JJ., concur in the result.

---

2. It is noted that the instant trial occurred after both the *Hardin* and *Brito* decisions.