Justin Lee MAY, Appellant,

v.

The STATE of Texas, Appellee.

No. 69453.

Court of Criminal Appeals of Texas, En Banc.

Feb. 18, 1987.

---

**264**

Jim D. Wiginton, Alvin, for appellant.

Jim Mapel, Dist. Atty. and Jim Turner, Asst. Dist. Atty., Angleton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(2). After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death. We will affirm.

The appellant was convicted of intentionally and knowingly causing the death of Jeanetta Murdaugh in the course of committing and attempting to commit the offense of robbery. The appellant raises eleven points of error. He challenges the denial of his motion to dismiss; the trial court's failure to strike the jury panel; the trial court's failure to give him notice of the list of venirepersons prior to trial; the exclusion for cause of two potential jurors; the removal of two other venirepersons upon the State's peremptory strikes; the denial of his motion to take depositions of three State's witnesses; the State's failure to disclose a change in the statement of the accomplice witness; the admission in evidence, at the guilt/innocence stage of the trial, of testimony regarding an extraneous offense and of a letter not produced before trial; and, finally, the sufficiency of the evidence to corroborate the testimony of the accomplice witness.

In his eleventh point of error, the appellant contends that the evidence is insufficient to corroborate the testimony of the accomplice witness, Richard Allen Miles.

Miles was an accomplice witness as a matter of law as charged by the court in its jury instructions at the guilt/innocence stage of the trial. He acknowledged three prior convictions and admitted that he had made an agreement with the State for his testimony: on his plea of guilty to a lesser offense, Miles was to receive a 42 year prison sentence, and the State would not oppose his eligibility for parole.

Miles testified that on June 26, 1978, he and the appellant drove from Houston to Freeport. He carried with him a .32 caliber pistol in the glove compartment of his car. After registering at a motel under an assumed name, Miles left the appellant and went to visit a friend. When he returned, the appellant outlined plans to commit a robbery at the Western Auto store operated by Frank and Jeanetta Murdaugh. The appellant had gone to the store earlier that day and had told the clerk that he was looking for a shotgun for a relative, and that relative would come in later to pick it up. Miles was to enter the store first, posing as the relative, and the appellant was to follow, armed with Miles' pistol. Miles was to select a shotgun and load it for additional security.

The next day, June 27, 1978, Miles drove past the Western Auto store and let the

appellant out at the corner. He parked the car and went into the store, with the appellant following just behind him. The appellant's shirttail was out in order to conceal the pistol. Miles went to the gun racks and noticed Jeanetta Murdaugh behind the counter and Frank Murdaugh arranging inventory at a parts shelf. Miles selected a shotgun and Frank Murdaugh handed it to him. He took a shell and began to load the gun. Frank Murdaugh told Miles that loading the weapon was prohibited and reached for the gun. At that point, the appellant fired a shot, and Frank Murdaugh fell to the floor. Miles, startled by the shooting, fired his shotgun into the ceiling, dropped the gun and headed for the front door. Miles saw the appellant shoot again, this time at Jeanetta Murdaugh. As Miles was leaving, he noticed two black men in front of the store. He got into his car and drove into an alley behind the store. The appellant ran out of the store with an armload of guns, dropping one in the alley. He got into the car and returned the .32 revolver to Miles.

Miles testified further that in a conversation at the county jail several months before trial, the appellant informed him that the appellant's mother had disposed of a rifle and Jerry Barmore, a friend of the appellant's, would dispose of the rest of the guns.

Robert Dohle testified that on June 27, 1978, he went to the Western Auto store just prior to 6:00 p.m. As Dohle entered the store, he saw a man crouching outside and looking in the store window. When he saw Dohle, the man stood up, looked directly at Dohle, and walked away. Dohle entered the store and saw only Frank and Jeanetta Murdaugh present.

Upon hearing of the murders, Dohle called the Freeport police and gave a description of the man he had seen, including the detail that the man's shirttail was out. Six years later, Dohle identified photographs of the appellant, in two separate photo lineups, as the man he had seen on June 27, 1978.

Charles Wagner, who in 1978 was chief of detectives for the Freeport Police De-

partment, testified that he investigated the scene of the offense. He saw Frank Murdaugh lying on the floor behind the counter and just outside the store's office; Jeanetta Murdaugh lay just inside the office. There was a hole in the ceiling above the gun rack, and eleven slots on the gun rack were empty. Next to the gun rack was an open box of shotgun shells with one shell missing. Two guns were found lying on the floor, and one gun was found in a pile of brush in the alley behind the store. After some investigation, Wagner determined that eight guns were missing from the store's inventory.

Oren Howard testified that he met the appellant at the Ramsey One Unit of the Texas Department of Corrections. During the course of a conversation with the appellant, Howard informed the appellant that he was from Freeport. The appellant then asked him whether he knew the location of the Western Auto store and told him that he and his "fall buddy was going to hit that Western Auto store and that old man and woman died."

Howard related that he and the appellant engaged in another conversation during which the subject of the Western Auto store robbery was raised. Richard Miles was present during this conversation and told Howard that the appellant would "shoot a man right off of you." Miles then discussed robbing another store in Old Ocean owned by an old man and old woman. This idea did not appeal to the appellant; he reminded Miles that a death sentence was waiting for them in Freeport. The appellant then gave Howard the following account of the Western Auto store robbery.

Told me that they pulled up to the store. He walked in first. Went over to some shelves where they put stuff on shelves. There was an elderly woman over there close to the shelves and an old man behind the counter. And that Miles walked in and was talking to the old man about a shotgun; wanted to look at a shotgun or something. He said the old man handed him a shotgun. Then he wanted some shells. He told him he would take the

shotgun and wanted some shells. Said the old man handed him some and he started loading the shotgun in the store and said the old man snapped and grabbed the shotgun and told him he can't do it, and was wrestling over the shotgun and it went off and hit the ceiling. The old woman hollered and started running that way and Justin [the appellant] said he blowed her away from behind. And they was still wrestling over the shotgun; this old man and Miles. Miles then told Howard that "he [Miles] turned around and looked at Justin and Justin spun around and shot the old man off of him."

Howard stated that the appellant then told Miles, "Let's get it." The appellant took some money from under the counter and some guns. As the appellant and Miles were leaving the scene, a car pulled up and they saw two black men in it. The appellant told Howard that "one of them got out and they both opened up on them and they took off running and driving off." The appellant also told Howard that more than one pistol was used in the robbery, and he had thrown the pistols involved into the Gulf.

Sam Cietto, a representative of the appellant's 1978 employer, testified that on June 26 and 27, 1978, the appellant was absent from work without excuse.

C.E. Anderson, a firearms examiner for the Houston Police Department, stated that five of the six rounds recovered in the Western Auto store could be positively identified as .32 caliber, and that they came from the same weapon.

Oven V. "Jerry" Barmore testified that he knew the appellant. He acknowledged possession of two of the weapons stolen in the Western Auto robbery, although he denied receiving the guns from the appellant.

Dr. Joseph Jachimcyzk, Chief Medical Examiner of Harris County, performed the autopsies on Frank and Jeanetta Murdaugh. He described two bullet wounds sustained by Jeanetta Murdaugh and four bullet wounds sustained by Frank Mur-

daugh. Two .32 caliber bullets were recovered from each body.

Retha May, the appellant's mother, identified a letter from her son directing her to dispose of a .308 rifle. Chief Wagner confirmed that a .308 rifle stolen from the Western Auto store had not been recovered.

Article 38.14, V.A.C.C.P., provides as follows:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

The trial court charged the jury that Miles was an accomplice and that the appellant could not be convicted without corroboration of Miles' testimony. The appellant contends that there is insufficient evidence to corroborate Miles' testimony to the commission of murder and of robbery or attempted robbery.

Arguing that the evidence is insufficient to corroborate the accomplice testimony regarding the appellant's participation in the robbery, the appellant cites *Fortenberry v. State*, 579 S.W.2d 482 (Tex.Cr.App.1979) and *County v. State*, 668 S.W.2d 708 (Tex. Cr.App.1984) for the proposition that the accomplice witness' testimony must be corroborated as to the specific element which elevates the offense to capital murder. Since the appellant's brief was prepared, however, *Fortenberry* and its progeny were expressly overruled in *Holladay v. State*, 709 S.W.2d 194 (Tex.Cr.App.1986), which held that the testimony of an accomplice witness in a capital murder case does not require corroboration concerning the elements of the aggravating offense. See also *Romero v. State*, 716 S.W.2d 519 (Tex. Cr.App.1986). We will, however, address the appellant's contention that the evidence is insufficient to corroborate the accomplice testimony as to the commission of murder.

The testimony of an accomplice witness is corroborated sufficiently if, after eliminating from consideration the testimony of the accomplice, there is inculpatory

evidence which tends to connect the defendant with the commission of the offense. *Vertz v. State*, 702 S.W.2d 196 (Tex.Cr. App.1986); *Moore v. State*, 700 S.W.2d 193 (Tex.Cr.App.1985), cert. denied, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 289 (1986). The corroborating evidence need not directly link the defendant to the crime or be sufficient in itself to establish guilt. *Adams v. State*, 685 S.W.2d 661 (Tex.Cr. App.1985).

■ In the instant case, the evidence indicated that the victims were shot with a .32 caliber weapon. The appellant was seen by Robert Dohle outside the Western Auto store just before the murders took place. Finally, the appellant told Howard that he participated in the robbery and shot the victims himself.

We find that the appellant's admissions to Howard, coupled with the corroboration of the appellant's presence at the scene of the offense and the use of a .32 caliber weapon, is sufficient to corroborate the testimony of the accomplice witness regarding the appellant's participation in the murders. Even employing the former standard of *Fortenberry* and its progeny, we find the corroboration sufficient to connect the appellant to the commission of robbery. Point of error eleven is overruled.

■ In his sixth point of error, the appellant contends that the trial court failed to give him notice of the list of venirepersons in accordance with Article 34.04, V.A.C. C.P.[1]

The record indicates that on January 14, 1985, the potential jurors were summoned and sworn, and the appellant received a copy of the jury list. The trial judge made introductory remarks, inquired into the potential jurors' qualifications, and distributed a questionnaire to aid in voir dire examination. Three days later, on January 17,

general voir dire questioning was conducted by the trial court, the State, and counsel for the appellant. Individual voir dire examination began on January 18.

Relying on *Marshall v. State*, 444 S.W.2d 928 (Tex.Cr.App.1969), the appellant contends that he was not given the requisite two days' notice of the jury list prior to the commencement of trial. However, in *Marshall,* it appears that the defendant was served with the jury list on the same day that trial began.

As this Court noted in *Wesley v. State*, 142 Tex.Cr.R. 501, 147 S.W.2d 493 (1941),

[I]t was the intention of the Legislature that the defendant should be served ... with a copy of the list of those actually summoned to appear in court so that he may have a correct list of all persons summoned as prospective jurors for at least one full day[2] exclusive of the day of service and the day of trial *in order that he may acquaint himself with the names of the men actually summoned.*

*Id.* at 496 (emphasis added).

In the instant case, the appellant received the jury list on January 14, 1985. Voir dire examination began on January 17.[3] We find that the appellant was given two full days, January 15 and 16, to familiarize himself with the names of the venirepersons summoned. Point of error six is overruled.

In his tenth point of error, the appellant complains that the trial court erred in allowing the State to peremptorily challenge two prospective jurors who stated that they could fairly pass on both stages of the trial, although they did not believe in the death penalty. He argues that the removal of these jurors deprived him of his right to a trial by a jury of his peers. See U.S. Const. amend. VI, XIV. We disagree.

---

1. Article 34.04 states, in pertinent part: No defendant in a capital case shall be brought to trial until he shall have had at least two days (including holidays) a copy of the names of the persons summoned as veniremen, for the week for which his case is set for trial except where he waives the right....

2. The law existing at the time *Wesley* was decided required only one day's service of the jury list before the commencement of trial. See Art. 601, V.A.C.C.P. (1925), repealed by Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.

3. The trial judge's preliminary remarks did not initiate voir dire examination. See *Williams v. State,* 719 S.W.2d 573 (Tex.Cr.App.1986).

One purpose of peremptory strikes is to exclude potential jurors in whom the advocate discerns a disaffection with his cause. A party need not assign a reason for exercising his peremptory strikes, see Article 35.14, V.A.C.C.P., and there is no restriction on the right of either side to peremptorily challenge prospective jurors to the extent of the number fixed by the statute. *Ross v. State*, 157 Tex.Cr.R. 371, 246 S.W.2d 884, 886 (1952).[4] Point of error ten is overruled.

In his seventh point of error, the appellant claims that the trial court erred in failing to strike the jury panel because of the premature closing of the wheel to qualified voters. At trial, the appellant filed a motion to strike the jury panel on the grounds that the jury wheel method of selection violated the fair cross-section requirement of the Sixth Amendment. At a hearing on the motion, testimony of the data processing manager of Brazoria County indicated that in 1984 the county used a jury wheel to select potential jurors which was taken from the valid voter registrants as of June 30, 1984. Between June 30, 1984, when the list was closed, and the November 1984 election, an additional 10,000 voters were added to the Brazoria County voter registration list. Thus, approximately 10,000 Brazoria County citizens who registered to vote during the second half of 1984 were not included in the selection pool from which the panel used in the appellant's case was chosen.

The appellant argues that he is entitled to a jury of his peers at the time of his trial, not at an earlier date which fails to take into account over 10,000 prospective jurors. He asserts that the jury wheel system used in his case, by failing to consider those eligible potential jurors, violated state and federal constitutional requirements.[5]

The State contends that even if the pool of potential jurors was closed prematurely, there was substantial compliance with the statute regulating the composition of the jury wheel. See V.T.C.A., Government Code § 62.001(a) (setting the date for composition of the jury wheel between August 1 and August 15).

Section 62.001(a), supra, requires that the county tax assessor-collector, sheriff, county clerk and district clerk shall place in the jury wheel the names of all persons known to them at the time to be qualified jurors in the county. The intentional omission of names will be ground to quash the venire. *Vasquez v. State*, 76 Tex.Cr.R. 37, 172 S.W. 225 (1914). Further, the venire should be quashed if there is a showing that those preparing the list made some effort to place any name ahead of another, or if the manner in which the venire list was drawn resulted in harm to a defendant. *Harrington v. State*, 424 S.W.2d 237 (Tex.Cr.App.1968). Reversible error is not shown where the record merely reflects that the jury pool is not as large as it might have been if there was strict compliance with the statute. See *Devault v. State*, 159 Tex.Cr.R. 360, 264 S.W.2d 126 (1954).

Here, the appellant has failed to show any intentional omission of names from the jury pool. At most, he has shown a diminution in the number of eligible potential jurors. Nor has he demonstrated that he sustained any harm as a result of closing the jury wheel prematurely. We have previously approved the use of voter registration records in the composition of jury panels. See *Thomas v. State*, 496 S.W.2d 578 (Tex.Cr.App.1973). The appellant has failed to show systematic exclusion of any group in the composition of the jury wheel. See *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). We overrule the appellant's seventh point of error.

In point of error eight, the appellant asserts that the trial court should have

---

**4.** The recent decision of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) will limit the rule in *Ross*. However, the appellant does not claim here that the State exercised

its peremptory challenges in a racially discriminatory manner.

**5.** The appellant relies upon U.S. Const. amends. VI & XIV and Tex. Const. art. I, §§ 10, 15 & 19.

granted his motion to quash the venire because the panel did not reflect the ethnic composition of Brazoria County. At the hearing on the motion, the appellant presented evidence from the 1980 census that blacks and Hispanics comprised 7.7 percent and 13.3 percent, respectively, of the population of Brazoria County. The jury panel summoned in the appellant's case contained one hundred one venirepersons. Two members of the panel were black and two or three were Hispanic. The trial court denied the motion.

The appellant now contends that the disparity between the ethnic composition of Brazoria County generally and that of the jury panel in his case constituted a violation of his Sixth Amendment right to a jury drawn from a fair cross-section of the community.[6]

This Court has long held that the Constitution does not require proportionate representation of races on jury panels, although selection of the panel must be without discrimination as to race. See *Rodriguez v. State*, 513 S.W.2d 22 (Tex.Cr.App.1974). A violation of the Sixth Amendment occurs where underrepresentation of a distinctive group in the community results from systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

 Disproportionate representation in a single panel does not demonstrate the systematic exclusion of distinctive groups in violation of the appellant's rights under the Sixth Amendment. In fact, testimony reflects that the panel was selected from a computerized list of registered voters. No opportunity or method for systematic exclusion is shown. Point of error eight is overruled.

In his ninth point of error, the appellant claims error in the trial court's removal for cause of two prospective jurors, James Guyton and Martha Breeden. During the voir dire process, both venirepersons stated

that they had conscientious scruples against the death penalty and would not vote for the imposition of the death penalty under any circumstances.

 We note that the appellant raised no objection to the removal of Guyton from the panel. Hence, his failure to object waives any alleged error with regard to the trial court's action as to Guyton. *Guzmon v. State*, 697 S.W.2d 404 (Tex.Cr. App.1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1479, 89 L.Ed.2d 734 (1986); *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984). However, we have examined the record of Guyton's voir dire testimony, in which he stated that he would not consider imposing a death sentence under any circumstances. We find, therefore, that Guyton was properly removed for cause.

We next address the point of error regarding Breeden, to whose removal the appellant did object. The following is an excerpt from the voir dire testimony of Martha Breeden:

[THE COURT]:

What I need to know is, if you are on this jury, can you sit during the first phase of the trial and make a decision strictly on the facts, as they are presented to you, without being influenced by the knowledge that if you find him guilty of capital murder that the punishment will either be the death penalty or life imprisonment, or would the knowledge that you have that that would be the only two alternatives, in the event you found him guilty of capital murder, influence your decision when it came to making the decision on the guilt or innocence?

[THE WITNESS]:

No, no.

Q. No, it would not influence you?

A. Right. No.

. . . .

Q. Okay. Let me ask you this. Do you have conscientious scruples in regard to the infliction of the punishment of

---

**6.** The appellant does not raise a claim under the Fourteenth Amendment or under any state constitutional provision.

death for a capital crime? Are you opposed to the death penalty?

A. I am not opposed to it, but now whether or not I could, you know, personally—I don't know that I could, you know, vote in favor of that.

Q. Okay. Let me ask it this way. Would you automatically vote against the death penalty, no matter what the facts of the trial might reveal?

A. Yes, I think I would.

Q. Okay. Let me ask this question. Are you irrevocably committed before the trial ever begins, at this point, to vote against the death penalty regardless of the facts and circumstances that might emerge during the course of the trial?

A. Yes.

Q. Then let me ask it one more way, and again I am not trying to pick with you, but—

A. No, but that's right.

Q. —I want to make sure we understand you.

A. That's right.

Q. Are you willing to consider all the penalty [sic] provided by law, that means the death penalty and life imprisonment, if there is a conviction in a capital case, or are you only going to consider one of those?

A. Well, I would only consider one of them.

Q. And which one would that be?

A. Life.

. . . .

[PROSECUTOR]:

You are saying you would automatically give life in this case because the other guy only got 42 years, is that what you are telling us?

A. Not necessarily that he got 42 years, but because of the character of these other witnesses.

. . . .

Q. Would you automatically exclude or not believe the testimony of an accomplice whether or not it was corroborated?

A. Well, it would be difficult to know whether or not he was telling the truth.

Q. Does the fact that the witness has been in prison on a prior occasion make you automatically disbelieve his testimony?

A. It would be hard for me to believe him, yes.

Q. Would you automatically disbelieve him?

A. I don't know whether I would completely disbelieve him, but there might be some doubt.

Q. But you would automatically vote for life, if it got to that point in this case, because of your feelings about the witnesses?

A. Yes, sir.

Q. You have already formed an opinion and you would automatically vote against death, then?

A. Yes.

Q. And to do that, you would have to automatically vote "no" on one of those questions?

A. Uh-huh (indicating affirmation).

Although Breeden stated that she could never impose the death penalty, she did indicate that she could fairly deliberate on the issue of guilt. The appellant asserts that her removal for cause violated his Sixth Amendment right to be tried on the issue of guilt/innocence by a jury of his peers, some of whom could deliberate upon guilt but who could not vote to impose the penalty of death.

 This issue has been resolved adversely to the appellant's position in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In *McCree*, the Supreme Court held that "death qualification" in a bifurcated trial, the process of excluding certain potential jurors who are opposed to the death penalty, does not violate the fair cross-section requirement of the Sixth Amendment. Hence, it was not error to remove Breeden from the panel. Notwithstanding the fact that she stated she could fairly deliberate on the issue of guilt, she asserted unequivocally that she would not vote to impose the death penalty

under any circumstances.[7] Point of error nine is overruled.

■ In his first point of error, the appellant contends that his case should have been dismissed because of the State's alleged failure to comply with the Speedy Trial Act, Article 32A.02, V.A.C.C.P.

The record indicates that the appellant was indicted on April 3, 1984, commencing the 120 day time period in which the State had to be ready for trial in a felony case. Article 32A.02, §§ 1(1) & 2(a), V.A.C.C.P. He was arraigned on April 11, at which time the State announced ready for trial, the trial court ordered that no bond would be permitted, and the case was set for trial on July 30.

The appellant filed a motion for discovery and inspection. On June 12, 1984, the trial court granted the motion as to certain items and ordered that said items be produced by July 9.

On July 13, 1984, the appellant requested a continuance on the ground that the State had not fully complied with the court's discovery order. The court ordered that discovery be completed by July 27, granted the appellant's motion for continuance, and reset the trial date for January 14, 1985. At the hearing, the trial judge stated his reasons for postponing the trial until January. He noted that three cases were preferentially set in his court in August, September and October. In addition, he stated that he did not want to try a capital murder case over the November and December holidays.

On July 27, 1984, the date discovery was to be completed, the State made various items available to the appellant's counsel. Additional items were made available some time during the month of August 1984 and on January 7, 1985, just prior to trial.

The appellant argues that the State's announcement of ready for trial "means not only that the State has performed the boilerplate contained in its written announcement of ready for trial in that it has fully investigated and reviewed the case, but also that the State has complied with all lawful orders of the Court which required execution within the time limits of Article 32A.02[, supra]...." We disagree. Article 32A.02 does not require that the State actually attempt to set a case for trial within the allowed period of time; nor is it mandatory that a case be tried within the 120 day statutory period. *Philen v. State*, 683 S.W.2d 440 (Tex.Cr.App.1984). Instead, the State must declare within the prescribed time limit that it is ready to proceed to trial.

■ The State's declaration of readiness is a prima facie showing that the State is ready for trial as the statute requires. *Barfield v. State*, 586 S.W.2d 538 (Tex.Cr. App.1979). Such prima facie showing must be overcome by the defendant; otherwise, denial of the appellant's motion to dismiss will be proper. *Apple v. State*, 647 S.W.2d 290 (Tex.Cr.App.1983); *Scott v. State*, 634 S.W.2d 853 (Tex.Cr.App.1982). In addition, Article 32A.02 does not require dismissal for delays in which the defendant is a willing participant or which are attributable to a crowded docket. *Philen*, supra.

■ The trial in this case was first continued at the appellant's request. At that time, the trial judge set the appellant's trial date for January 14, 1985, citing as his reasons the crowded docket and his desire not to try the case over the holidays.[8] With regard to the appellant's claim that discovery was not timely completed, our review of the record indicates that the trial court ordered completion of discovery by July 27, 1984, and the State tendered sub-

---

7. We note that Breeden's removal for cause was also proper under Art. 35.16(b)(3), V.A.C.C.P., since her testimony indicated a "bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment[;]" that is, the law providing for a conviction upon accomplice testimony which has been sufficiently corroborated. See Art. 38.14, V.A.C.C.P.

8. We note that neither of these reasons qualifies as an excludable period within the meaning of Article 32A.02, supra. See *Santibanez v. State*, 717 S.W.2d 326, 331–33 (Tex.1986) (Clinton, J., concurring); *Barfield*, supra.

stantially complete discovery on that date. We hold that the appellant did not overcome the State's prima facie showing of readiness for trial, and his motion to dismiss was properly denied. Point of error one is overruled.

In his second point of error, the appellant challenges the admission in evidence, at the guilt/innocence stage of the trial, of testimony regarding an extraneous offense. Prior to trial, the appellant's motion in limine was granted with regard to extraneous offenses. At trial, the State offered in its rebuttal the testimony of Retha May, the appellant's mother. May was questioned about a letter she received from the appellant concerning a rifle. She testified she had thrown a rifle in the San Jacinto River and that she had discussed the rifle's disposal with Johnny Bonds, a Houston police detective. The State asked May as to when she recalled discussing the rifle with Bonds, and the following exchange took place:

Q. Do you recall when that was that you told him about this and went out there and showed him where you threw it?

A. No.

Q. Be around the end of October of '78?

A. I know it was after 31st of March. I mean August.

Q. 31st of August sticks in your mind. Why?

A. That's when he was picked up. It was after that.

The court overruled the appellant's motion for a mistrial. The appellant did not ask for an instruction that the jury disregard May's testimony.

The trial court's ruling on the motion in limine ordered the State not to elicit testimony as to why the appellant was in the Texas Department of Corrections at the time of his indictment for the instant offense unless the appellant "opened the door" as to either of the two convictions for which he was incarcerated.

The appellant was arrested on August 31, 1978 for aggravated assault, to which he ultimately pled guilty and for which he was incarcerated in the Texas Department of Corrections. As a result of the investigation surrounding that arrest, he was also charged with murder, to which he pled guilty and for which he was also incarcerated in the Texas Department of Corrections. He now claims that the testimony referring to his being "picked up" was in violation of the motion in limine, was material and prejudicial, and was not cured by the court.

We can not agree that the witness' unresponsive reference to the appellant's arrest violated the motion in limine. The witness did not state *why* the appellant had been arrested or that the arrest eventually led to his incarceration. The jury could have inferred from the testimony that the appellant had been arrested for the instant offense on August 31, 1978. Hence, there is no showing that the appellant was prejudiced by the witness' answer.

Even assuming that the testimony did violate the motion in limine, however, the error could have been cured by an instruction to the jury to disregard the witness' statement. See *Guzmon,* supra; *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr.App.1985). By failing to request such an instruction, the appellant has waived any error. Point of error two is overruled.

In his third point of error, the appellant argues that the trial court should have granted his motion for mistrial. He asserts that the State failed to advise him of two "substantial" changes in testimony to be given by the accomplice witness. He also claims that he was not aware of such changes.

On May 30, 1984, the appellant filed a motion for discovery in which he requested evidence that would tend to exculpate his guilt or mitigate punishment. The request was granted, and on January 3, 1985 the court ordered the State to produce three statements given by the witnesses Dohle, Howard and Miles.

In his statement, the accomplice witness, Miles, asserted that he and the appellant entered the store together. At trial, Miles testified that before he parked the car, he let the appellant out at a corner past the

store, drove around the block, parked near the store and entered first. Miles also testified that he had advised the State of the change in his story in either November or December of 1984.

In his written statement, Miles also asserted that after the murders he and the appellant drove back to Houston, where they went directly to a bar called Garcia's. At trial, Miles testified that in addition to going to Garcia's on that night, they returned to the bar the following morning.

At the conclusion of Miles' testimony, the appellant requested a mistrial on the ground that these changes in Miles' version of the events surrounding the offense, although known to the State, had not been furnished to him, and that such withholding had impaired the appellant's ability to adequately prepare his defense. The court denied the appellant's motion.

We recognize that the State is under a continuing duty of disclosure after initial compliance with a discovery order. *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr. App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). However, on the facts of this case we can not conclude that the State's failure to disclose the abovementioned variances between Miles' written statement and his testimony at trial constitutes reversible error. Notwithstanding his assertion that the additional information would have assisted him in preparing his case, the appellant fails to specify how he could have used such information. We are unable to conclude that the knowledge by the appellant before trial that Miles dropped the appellant off at the corner before parking his car, or that the two men went to Garcia's a second time on the morning following the murders, would have had a material effect on the outcome of the trial. We find that these differences in Miles' statement are neither material nor exculpatory, and the State's failure to disclose them before trial did not violate the court's discovery order. Cf. *Turpin v. State*, 606 S.W.2d 907 (Tex.Cr.App.1980); *Mott v. State*, 543 S.W.2d 623 (Tex.Cr.App. 1976). Point of error three is overruled.

In his fourth point of error, the appellant claims error in the trial court's denial of his motion to take the depositions of the State's witnesses Dohle, Howard and Miles. See Article 39.02, V.A.C.C.P.

Article 39.02 provides that a defendant may take a deposition upon a showing of "good reason" for doing so. The trial judge has wide discretion in deciding whether to order a deposition. *James v. State*, 563 S.W.2d 599 (Tex.Cr.App.1978); *McKinney v. State*, 491 S.W.2d 404 (Tex. Cr.App.1973). It is incumbent upon a defendant to show a good reason for the deposition; and, in the event his request is denied, he must demonstrate harm to establish an abuse of discretion. *James*, supra.

In the instant case, all three witnesses testified at trial and were cross-examined. See *James*, supra. Dohle also testified and was cross-examined during the pre-trial suppression hearing. In addition, the trial court permitted the appellant to conduct extensive voir dire examination of Howard and Miles, outside the presence of the jury, to determine the admissibility of their criminal records. More significant is the fact that the appellant was provided with the written statements of the three witnesses ten days prior to the commencement of trial. Accordingly, we hold that the trial court's refusal to order depositions of Dohle, Howard and Miles did not harm the appellant. Such refusal did not, therefore, constitute an abuse of the court's discretion. Point of error four is overruled.

In his fifth point of error, the appellant challenges the admission in evidence, during rebuttal, of a letter written by the appellant.

In its discovery order, the trial court directed the State to furnish to the appellant "[a]ny and all written statements or letters, alleged to have been made by the [appellant] and which have a connection with or bearing on the events involved in the indictment" which the State intended to offer as evidence in its case in chief.

At trial, after the State rested its case in chief, the appellant called Ronald Hare as a witness on his behalf. Hare stated that he had learned of a .308 rifle taken in the robbery and had disposed of the rifle. He denied knowing of any involvement by the appellant in the robbery.

In rebuttal, the State called Retha May, the appellant's mother, and offered in evidence a letter written to her by the appellant. In the letter, the appellant directed his mother to dispose of a .308 rifle.

The appellant objected on the basis that the State had failed to comply with the court's discovery order. The court overruled the objection, and the letter was admitted in evidence.

A defendant does not have a general right to discovery of evidence in the possession of the State, even if the evidence is the appellant's own statement. See *Quinones v. State,* 592 S.W.2d 933 (Tex.Cr.App.1980), cert. denied, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121. In the instant case, the State's duty to provide statements made by the appellant was based on the court's discovery order, which required the State to furnish any statements which would be offered in its case in chief. After the appellant introduced the testimony of Hare claiming that he had disposed of the .308 rifle taken in the robbery, the State was entitled to rebut Hare's testimony by offering the appellant's letter. We find that such offer did not violate the court's discovery order. Point of error five is overruled.

Having considered the appellant's points of error and finding no reversible error, we affirm the judgment of the trial court.

MILLER, J., joins except for that part of the opinion dealing with Point of Error #5, where he only agrees that the point does not merit reversal.

TEAGUE, J., dissents only as to that part of the opinion dealing with prospective juror Breeden.

CLINTON, J., dissents.

DUNCAN, J., not participating.