Broome/Lazarus v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-91-041-CR
No. 10-91-042-CR

     STEVE BROOME,
                                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                                              Appellee

 

No. 10-91-043-CR
No. 10-91-044-CR

     MARTIN DELANEY LAZARUS,                                       Appellant

     v.

     THE STATE OF TEXAS,                                                  Appellee
 

From the 54th District Court
McLennan County, Texas
Trial Court Nos. 90-362-C, 90-363-C, 90-360-C & 90-361-C
                                                                                                    

O P I N I O N
                                                                                                    

      Appellants Lazarus and Broome, at their request, were tried jointly


 on sexual molestation
cases involving two boys. Lazarus was indicted for aggravated sexual abuse


 and indecency with
a child


 while Broome was indicted for two counts of aggravated sexual abuse


. A jury found
Lazarus and Broome guilty as charged. The Appellants elected to have the Court assess
punishment. Lazarus was sentenced to 35 years in prison for aggravated sexual abuse and 10
years for indecency with a child, with the sentences to run concurrently. Broome was assessed
concurrent sentences of 35 years each.
      In three points of error, Appellants complain that (1) the court erred in admitting evidence
from the State's final rebuttal witness because that witness' testimony had slight probative value
and great potential to inflame the jury against the Appellants; (2) the court erred in excluding
evidence proffered by the Appellants that would have raised a reasonable doubt concerning the
veracity and credibility of one of the complainants, and (3) the court erred in denying the
Appellants' pretrial discovery motions. We will affirm.
      Some factual background is necessary before we discuss Appellants' complaints. The victims
are two boys, R. W., aged l2, and J. S., aged 13. R. W. met Lazarus, aged 40, and Broome,
aged 32, at their business in Waco, known as Bargain Hunters, which was described as a "buy-and-sell-anything" type of business. R. W.'s father frequently sold items of personal property to
Bargain Hunters prior to his being sent to prison for burglary. After R. W.'s father went to
prison, Lazarus hired R. W. to work part-time at Bargain Hunters. He also secured an apartment
for R. W., his mother, and his younger brother and helped pay the rent each month. Lazarus
testified that he became a "father figure" for R. W. while his father was in prison. On the job,
R. W. helped Broome repair furniture and appliances and was in close contact with Broome. This
apparently led to a relationship where Broome would use R. W. for sexual purposes, such as
masturbation and sucking R. W.'s penis. The evidence reveals that R. W. quit work for a short
period of time because of Broome's conduct but ultimately went back to work because he said he
needed the money. R. W. testified that after returning to work Broome and Lazarus molested him
50 to 75 times before these complaints were filed.
      R. W.'s friend, J. S., sometimes came to Bargain Hunters to see R. W. and later visited the
shop because his stepfather worked there. J. S. was described as "hyperactive," had always
attended special education classes in school, and was somewhat handicapped physically because
of a leg brace.
     The indictments involved an incident in which R. W. and J. S. were in a bedroom in
Appellants' house on June 15, 1989. So as not to mischaracterize what happened, we set out
J.S.'s description of the event on direct examination by the State:
QWho all was in the bedroom?
AMe, [Broome], and R. W., and [Lazarus].
QOkay. Now, tell us again what happened when you were back in that bedroom?
A[Lazarus] told us to take our pants down to our knee, and then he told—[Lazarus]
told [Broome] to suck on my thing, and he did.
QOkay. To suck on your thing?
AYeah.
QWhat do you mean by "thing"?
AOn my penis.
QThat was [Broome]?
AYes.
Q[Lazarus] told him to do it?
AYes.
QAnd did [Broome] do it?
AYes.
QHow did that make you feel?
AScared.
QDid anything else happen back in that bedroom?
AYeah. He told [R. W.] to cum on my chest.
QDid [R. W.] do that?
ANo.
. . .
QOkay. Explain what you mean. Who was supposed to cum on whose chest?
A[R. W.] was supposed to cum on my chest.
QBut who got hit in the forehead, [J. S.]? That's what I am trying to get you to talk
about.
A[Broome].
QGot hit in the forehead?
AYeah.
QBy who?
ABy [R. W.].
QOkay. Did they pay you for doing that?
AYeah.
QHow much did they pay you?
AThey gave me three dollars.
QDid they pay [R. W.]?
AYeah. They gave him five dollars.
QHow come you only got three dollars?
ABecause [Lazarus] told me if I learned how to cum, he would give me five dollars.
      Following this episode, the Appellants and the two boys went to R. W.'s mother's house
where Broome and J. S. walked down to a creek behind the house. The testimony of J. S.
concerning this incident is as follows:
QDid you go down to the creek?
AYeah.
QWho did you go down to the creek with?A[Broome].
QWhat happened when you got down to the creek?
A[Broome] was feeling on me and all that.
QWhat do you mean by feeling on you?
AFeeling like that on me.
QOkay. Did you have your pants on still?
AYeah.
QOkay. What else did he do?
AAnd then he told me to take my pants down.
QDid you?
AYeah.
QHow far did you take them?
ADown around my knees.
QWhat happened when you pulled your pants down?
A[Broome] wanted to lick my behind.
QWhat do you mean by "behind"? Back where you go to the bathroom?
AYeah.
QDid he do that?
AYes.
QCould you feel his tongue back there?
AYes.
QHow did that make you feel, [J.S.]?
AScared.
QDid he do anything else to you while you were down there?
AYeah.
QWhat?
AHe sucked on my thing.
QOkay. Did he make you suck on his penis while you were down there?
AYeah.
QHow did that make you feel.
AGross. Scared. . . .
      In Appellants' first point, they complain that the Court erred in allowing the State's final
rebuttal witness, Jerry S., aged 11, to testify about an extraneous offense which occurred at R.
W.'s house late one night in September 1989. The Appellants were in a back bedroom with R.
W., J. S., and another boy. Jerry S. was watching television in another room. Lazarus came out
of the bedroom and told Jerry S. to come to the bathroom with him to talk. Jerry S. testified as
follows:
QOkay. So go ahead. What happened next?
AAnd we went into the bathroom, and he started talking about sex and stuff.
QWho did that?
A[Lazarus].
QDelaney Lazarus, this man right down here at the end of the table?
AYes, sir.
QAll right. What happened next?
AAnd he started talking about have you ever jerked off or cummed and stuff.
QDid you know what he was talking about?
AYes, sir.
QOkay. What happened then?
AAnd he was—and he said if I was to get [Broome] in here to jerk off inside the tub,
would you like for me to do that? And I said no.
QAnd he was drunk when he was telling you this?
AUh-huh. He had a beer in his hand.
QDid he do anything to you?
AYes. He told me if I pulled my pants down, he would give me three dollars. And
so I did. And he looked at my private and said, "You're not ready for puberty," and he
was talking about puberty while he was talking to me about sex and stuff.
QOkay. What did he tell you about sex and stuff?
AHe was talking about have you ever done it with a girl and jerked off and cummed.
QOkay. How did that make you feel, Jerry?
AKind of stupid sometimes that night. But I was kind of nervous. I was real tired that
night. I was almost half way asleep.
QWhat else did he say when you took your pants down?
AHe just said, "You're not ready for puberty," and then he paid me three dollars.
QWhat did—did he offer to give you any more money if you would do something?
AYes. He said he would pay me five dollars if I was to jerk off and—to get my
private hard. Excuse me.
QTo get your private hard?
AUh-huh. And then he said he would give me ten dollars if I could cum.
QWere you able to get hard? Did you do any of those things?
ANo, sir. I didn't do none of them.
QDid you want to?
ANo, sir.
QAnd that's when he also asked if you wanted [Broome] to come in and jerk off in the
bathtub?
AUh-huh. . . .
      Prior to the State's rebuttal witness, the Appellants testified in their own behalf. They denied
the allegations and claimed that R. W. and J. S. were lying as part of a conspiracy against them. 
In addition, the Appellants called several witnesses to testify in their behalf. Ronnie Banks had
lived next door to the Appellants for two years and Appellants' counsel elicited the following
testimony from him:
QDid you have an opinion regarding my client's character?
A[Broome] and [Lazarus], they seem very nice people to me.
PROSECUTOR: Your Honor, I'm going to object to that as a general question. We
don't know what it's based on.
THE COURT: Character as to what?
QCharacter to their morals, their ethics.
AThey seemed like nice people. Like I said, I associated—
      The court never ruled the above testimony inadmissible. Consequently, the moral character
of the Appellants was effectively injected into evidence by the defense.
      Next, Wayne McLaine, who had operated a business next door to the Bargain Hunters for
about two years, testified for the Appellants as follows:
QDo you have an opinion regarding my clients' reputation for truthfulness?
AOpinion?
QYes.
AAs far as I know them, they have always been hard working, young gentlemen.
QDo you think they tell the truth?
AI have never caught them in a lie.
      Three other defense witnesses, Larry Lenamon, W. B. Lenamon, and Ray Atchley each gave
opinion testimony that the Appellants were truthful.
      By injecting the Appellants' character into issue, the rebuttal testimony of Jerry S. becomes
relevant under Rules 401, 402 and 404.


 Even if the Appellants' character had not been placed
in evidence, we feel that the extraneous offense was relevant as "system" or "modus operandi"
evidence. See Owens v. State, No. 1039-90 (Tex. Crim. App. Mar. 4, 1992). Unlike Owens, the
facts here showed more than the mere repeated commission of crimes of the same type or class. 
The facts showed that Lazarus paid the victims small amounts of money for different levels of
sexual performance. The same "system" was used by Lazarus on the extraneous offense raised
on rebuttal when he offered Jerry S. $3 for exposing his private part, $5 for an erection, and $10
for a climax. We find this evidence meets the criteria referred to in Owens and Collazo v. State,
623 S.W.2d 647, 648 (Tex. Crim. App. 1981) for being "an earmark for the handiwork of the
accused" or a "device . . . so unusual and distinctive as to be like a signature." See Owens, slip
op. at 5. In applying the balancing test required by Rule 403 to determine if the probative value
of the extraneous offense is "substantially outweighed by the danger of unfair prejudice, confusion
of the issues, or misleading the jury, or by considerations of delay, or needless presentation of
cumulative evidence," we will apply the three criteria set out in Montgomery. See Tex. R. Crim.
Evid. 403; Montgomery, 810 S.W.2d at 389-393. First, since the extraneous evidence
demonstrated a distinctive characteristic of the charged offenses, we find that its relevancy
substantially outweighs its prejudicial value. Second, we find there was little potential for the
extraneous-offense evidence to impress the jury in some irrational way because it was brief
compared to the length of the trial and the "system" mentioned was not something new. It had
already been heard in previous testimony and should not have been distracting to the jurors. 
Finally, the State could demonstrate a need for this rebuttal evidence since the Appellants testified
that the alleged offenses never happened and that it was a conspiracy by the victims against them. 
Appellants also tried to leave the impression that they were the kind of person unlikely to commit
such an offense when defensive testimony was elicited that during the 1986 Christmas season they
collected over 1,000 stuffed animals and donated them to a charitable cause for children and that
Broome got a "thank-you letter" from the Waco Center for Youth for his donations. This
defensive evidence impugning the credibility of the young victims compelled the State to present
this rebuttal evidence. See Boutwell v. State, 719 S.W.2d 164, 179 (Tex. Crim. App. 1985). 
      Having found that the Appellants placed their character in evidence with their defensive
testimony and, alternatively, that the rebuttal extraneous-offense evidence was relevant and
admissible, and after applying the balancing test, we overrule point one. 
      In their second point, Appellants complain that the court erred in denying admission of
evidence from Vera Cruz concerning an incident on January 5, 1990, in which her 7-year-old son
told her that J. S. had asked him to "play with his private," but that no sexual contact occurred
between the two boys. In a hearing outside the presence of the jury, Vera Cruz testified that, after
she told J. S.'s mother about this, they confronted J. S. and he admitted that it had happened. 
Appellants contend that, soon after J. S. was confronted with this situation, he then told about the
sexual misconduct with the Appellants to deflect parental displeasure and possible punishment
from himself to the Appellants. In addition, the court refused to admit evidence from the
Appellants' private investigator, who had elicited evidence from Vera Cruz's son, in her presence,
that at some unspecified time there had been one incident of sexual contact between the two boys.
      We first address whether this "motive" evidence is admissible. "Relevant evidence" means
evidence having any tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be without the evidence. 
Tex. R. Crim. Evid. 401. The trial court has considerable discretion as to how and when bias
or motive of a witness may be proved and what collateral evidence is material for that purpose. 
Cloud v. State, 567 S.W.2d 801 (Tex. Crim. App. 1978); Smith v. State, 516 S.W.2d 415 (Tex.
Crim. App. 1974). The court could have found the evidence irrelevant because the motivation of
J. S. to finally tell his mother about the sexual misconduct of the Appellants is not material to
whether they committed the sexual assault on the victim, nor is it material to any lack of credibility
on J. S., who told the truth about the incident when confronted by his mother and Vera Cruz.
      Even if relevant, the court could have excluded the evidence because it was hearsay. The
testimony of Vera Cruz and the investigator concerning information her 7-year-old son had told
them, was clearly inadmissible under Rule 804 of the Texas Rules of Criminal Evidence. See
Tex. R. Crim. Evid. 804.
       Appellants contend the evidence was admissible under Rule 404(b) to show a motive for J.
S. to lie concerning the allegations against Appellants. See id. 404(b). We reject this contention
because, after excluding the hearsay portion of Vera Cruz's and the investigator's testimony, there
was no evidence of any "crime, wrong or act" committed by J. S. or anything about his character
which could be argued.
      Finally, we find the evidence was not admissible under Rule 608, which provides that the
credibility of a witness, including the victim, may be challenged in the form of reputation or
opinion testimony concerning only the witness' character for truthfulness or untruthfulness;
however, the rule prohibits the use of evidence of specific incidents of conduct for purposes of
challenging the credibility of a witness, unless it falls within the exceptions in Rule 609 requiring
a final criminal conviction. See id. at 608, 609.
      Having found that the proposed testimony was hearsay, irrelevant, and not admissible under
Rules 608 and 609, the second point is overruled.
      In their last point, Appellants complain that the court erred in denying their pretrial
application to take the depositions of the two victims, or of Carol Wilson, Terry Cox, and Jimmy
Welever. Appellants argue that this point of error rests on two planks: (1) that the complainants,
both minors, had demonstrably anti-social personalities, which raises considerable doubt
concerning the credibility of their accusations; and (2) that both complainants had powerful and
demonstrable motives for falsely accusing the Appellants. 
      Article 39.02 of the Texas Code of Criminal Procedure provides that, when a defendant
desires to take the deposition of a witness, the court shall hear his application and determine if
good reason exists for taking the deposition based on the facts made known at the hearing. Under
Article 39.02, the defendant who desires to take a witness' deposition must file an application and
an affidavit stating facts constituting food reason for taking the deposition, and the determination
of whether good reason exists shall be based on the facts made know at the hearing: ". . . the
court, in its judgment, shall grant or deny the application on such facts." Tex. Code Crim. Proc.
Ann. art. 39.02 (Vernon 1979) (emphasis added).
      No affidavits were filed in support of the petition, consequently the only evidence upon which
the court could base its determination was the testimony elicited from Lazarus at the pretrial
hearing. At the hearing, Lazarus testified that he had received the statements of the victims and,
when told that the District Attorney had an "open file policy," responded, "That sounds fair." 
Lazarus stated that the victims and their families hated him and he needed their depositions to test
their credibility. All of the persons Appellants named in their request for depositions testified at
trial and were cross-examined at length. Appellants also requested to depose unnamed doctors,
therapists, and counselors of the victims and their families, but Lazarus gave no reason for these
requests other than speculation. Additionally, Appellants were provided with copies of both
victims' medical records and school records.
      The trial judge has wide discretion in deciding whether to order a deposition. It is incumbent
upon a defendant to show a good reason for the deposition; and, in the event his request is denied,
he must demonstrate harm to establish an abuse of discretion. May v. State, 738 S.W.2d 261, 273
(Tex. Crim. App.), cert. denied, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 158 (1987); James
v. State, 563 S.W.2d 599 (Tex. Crim. App. 1978). Lazarus' testimony was insufficient to
establish good reason or harm. Accordingly, we find the court did not err in denying Appellants'
application to take depositions. Point three is overruled, and the judgments are affirmed.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed April 22, 1992
Do not publish