**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-11-00642-CR**
_____

**TIMOTHY SCOTT WEEKS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 5**
**Montgomery County, Texas**
**Trial Cause No. 10-259081**

**OPINION**

A jury found Timothy Scott Weeks guilty of boating while intoxicated. Weeks challenges the denial of his motion to suppress, the jury selection process, and a ruling on an objection to the prosecutor's closing argument.

We conclude that the complaint about the stop and detention was not presented to the trial court for a ruling. But even if the issue is considered preserved for appellate review, no error occurred. The stop was authorized by

statute and the warden had reasonable suspicion for the brief investigative detention. On the objection that was made at trial, the trial court did not err in determining that the warden had probable cause to arrest. With respect to the jury selection process, the trial judge could reasonably find that Weeks did not present sufficient proof of the fair-cross-section claim. The record also reflects that the prosecution's argument was in response to a hypothetical presented by appellant's counsel. Concluding no reversible error has been raised by appellant, we affirm the trial court's judgment.

## THE FACTS

A Texas Parks and Wildlife game warden patrolling Lake Conroe received a call regarding intoxicated boaters. He followed a boat matching the description the caller gave. The warden positioned his boat next to Weeks's boat.

He identified himself as a state game warden. He explained at trial that he approached the boat to check for water safety equipment and in response to the call he had received. The warden asked Weeks, the operator of the boat, to produce the boat registration card and the required water safety equipment. The alcohol smell coming from Weeks, his slurred speech, his failure to produce water safety equipment at first request, his inability to properly put on a life vest, six clues of possible intoxication on the HGN test, his admission that he had consumed two

2

beers and a Gatorade and vodka, and his statement that he was "not totally wasted[,]" prompted the warden to investigate further onshore.

After giving Weeks time to adjust to being ashore, the warden administered the HGN test again. Weeks again exhibited all six clues of possible intoxication. He exhibited one out of a possible eight clues on the walk-and-turn test, and zero clues out of a possible four clues on the one-leg stand test. In the offense report, the warden noted that Weeks walked "heavy-footed" and his balance was unsteady. The warden testified based on his training and experience he determined that Weeks had operated the boat while intoxicated.

## THE MOTION TO SUPPRESS

Weeks argued in his motion to suppress that the detention, seizure, and arrest violated his rights as guaranteed to him by statute and both the federal and state constitutions. Among other things, Weeks claimed the warden did not have reasonable suspicion or probable cause to believe that Weeks was engaged in criminal activity. On appeal, he asserts evidence should have been suppressed because of the alleged "unlawful warrantless detention and arrest."

In reviewing a trial court's ruling on a motion to suppress, an appellate court gives almost total deference to a trial court's determination of historical facts, but reviews de novo the trial court's application of the law to those facts. *Carmouche*

3

*v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997)). The trial court's ruling will be affirmed if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

Section 31.124 of the Texas Parks and Wildlife Code authorizes an enforcement officer to "stop and board any vessel subject to this chapter" and to "inspect the boat to determine compliance with applicable provisions." Tex. Parks & Wild. Code Ann. § 31.124(a) (West 2002); *see also* §§ 31.031, 31.065, 31.067-.071 (West 2002), §§ 31.021, 31.032, 31.066 (West Supp. 2012) (requirements for boats). In *Schenekl v. State*, the Court of Criminal Appeals rejected a constitutional challenge to section 31.124 under the Fourth Amendment. *Schenekl*, 30 S.W.3d 412, 413, 416 (Tex. Crim. App. 2000). The Court noted that the State has a strong interest in promoting recreational water safety through the means provided: random water safety checks. *Id*.; *see also State v. Luxon,* 230 S.W.3d 440, 449 (Tex. App.—Eastland 2007, no pet.) ("Section 31.124(a) authorizes enforcement officers to stop and board boats, without probable cause or reasonable suspicion, for the purpose of performing a water safety check.").

Weeks argues nonetheless that the warden lacked reasonable suspicion or probable cause to stop or arrest him, and that the warden did not stop Weeks for the purpose of enforcing Chapter 31. *Compare Schenekl*, 30 S.W.3d at 417 (Meyers, J., concurring) ("It ought to be emphasized that the search authorized by the statute in question is narrow in scope and may not exceed its stated purpose, absent reasonable suspicion or probable cause."). According to Weeks, Chapter 31 does not apply here because the warden detained Weeks to investigate an uncorroborated tip. Weeks argues that his statements, the warden's observations, and the results of the sobriety and breath tests were therefore inadmissible under article 38.23 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. § 38.23 (West 2005) (exclusionary rule).

The State maintains Weeks waived his motion to suppress, and did not preserve the alleged error for review on appeal. There was no pre-trial hearing on the motion to suppress, and no ruling on the motion before trial. As a prerequisite to presenting a complaint for our review, a party must make the complaint to the trial court by a timely request, objection, or motion, and also obtain a ruling or object to the refusal to rule. Tex. R. App. P. 33.1; *Stults v. State*, 23 S.W.3d 198, 205-06 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (A timely objection should be made when the ground for objection is apparent.).

5

We do not find in the record that Weeks objected to the warden's testimony at trial concerning his reasons for stopping the boat, his observations, the actual sobriety tests, or his further onshore investigation to determine if Weeks was intoxicated. The trial court sustained the defendant's objection to testimony concerning the accuracy of testing done by the warden during his training. The warden testified without objection, however, to the circumstances leading up to the arrest.

When the State offered the DIC-24 (the "statutory warning-watercraft" document that informed Weeks he was under arrest and requested a breath specimen for testing), Weeks objected as follows:

> Judge, may we approach? I've got a motion to suppress on file that I believe is a good time right now. I'd ask at this point that you suppress all further testimony, evidence of the blood test, and any of the testimony that they did not have probable cause in this case to arrest Mr. Weeks based on his testimony so far.

As a general rule, the record must show that the complaint made on appeal was timely made to the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[.]" *See* Tex. R. App. P. 33.1. Weeks objected to "further testimony" and to the lack of "probable cause in this case to arrest[.]" By failing to object and obtain a ruling from the trial court, Weeks waived his objection and motion regarding the

6

warden's testimony concerning the stop and detention, the actual sobriety field tests performed before the arrest, and Weeks's statements. *See* Tex. R. App. P. 33.1.

When Weeks did object at the trial under his motion to suppress, he limited the scope of his motion and objection to whether the warden had probable cause to arrest Weeks "based on his testimony so far." He did not object to the stop and detention, or to the absence of reasonable suspicion. The objection was that, considering the warden's "testimony so far," no probable cause for arrest existed at the time of arrest. But based on the testimony admitted without objection, the trial court could reasonably conclude that, at the moment the arrest was made, the facts and circumstances within the warden's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man to believe that, more likely than not, Weeks had committed the offense of boating while intoxicated. *See Amador v. State*, 275 S.W.3d 872, 878-79 (Tex. Crim. App. 2009) (totality of the circumstances); *State v. Garrett*, 22 S.W.3d 650, 653-54 (Tex. App.—Austin 2000, no pet.) (Smell of alcohol, watery eyes, and unsteadiness help establish probable cause to arrest defendant for DWI.). The trial court did not err in overruling that objection.

7

Even if the objection is considered sufficient to preserve the issue concerning the stop and detention prior to the arrest, we see no error in the trial court's ruling. The stop was authorized under Chapter 31. *See* Tex. Parks & Wild. Code Ann. § 31.124 (West 2002). As authorized by the statute, the detention should be brief and the inspection narrow. *See id.*; *Schenekl*, 30 S.W.3d at 417 (Meyers, J., concurring). But if reasonable suspicion develops during a safety and regulatory compliance inspection under Chapter 31, a warden may briefly detain the suspect further for investigative purposes. *See generally Kuykendall v. State*, 335 S.W.3d 429, 431, 434-35 (Tex. App.—Beaumont 2011, pet. ref'd) (In conducting a welfare check, the officers' observations gave rise to reasonable suspicion sufficient to justify further investigation.). An officer has reasonable suspicion to detain a suspect if the officer has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person is, has been, or soon will be engaged in criminal activity. *See Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Weeks had some difficulty complying with the Chapter 31 inspection requests. The warden smelled alcohol on Weeks. And the warden had observed that Weeks was the operator of the boat. These facts, and reasonable inferences from them, support the further brief detention for investigative purposes. *See id.* Issue one is overruled.

8

FAIR-CROSS-SECTION CLAIM

Weeks complains that the jury selection process "denied appellant the right to a fair trial by an impartial jury." He argues that the procedure in Montgomery County at the time required jurors who chose to respond to the jury summons using the internet (e-jurors) to report directly to a trial court. Those who chose not to utilize the internet to respond to the summons appeared at "an alternate location," and were called only in the event there were not enough e-jurors for a court. As in appellant's case, this resulted in some venires being comprised only of e-jurors. Weeks argues:

> The jury selection process in Montgomery County excluded members of the community without internet access. As a result, individuals with an annual income below the poverty line were underrepresented. The underrepresentation of individuals with an annual income below the poverty line further excluded Hispanics and African-Americans.

The Sixth Amendment to the Constitution of the United States guarantees a criminal defendant an impartial jury selected from sources reflecting a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 526, 530-37, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In order for a defendant to establish a prima facie violation of the fair-cross-section requirement, the defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not

9

fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Pondexter v. State*, 942 S.W.2d 577, 580 (Tex. Crim. App. 1996). A defendant need not be a member of the underrepresented group to raise a fair-cross-section claim. *See Aldrich v. State*, 928 S.W.2d 558, 560 (Tex. Crim. App. 1996).

In analyzing the third requirement, the Supreme Court in *Berghuis v. Smith* required a showing of the cause of the underrepresentation. 559 U.S. 314, 130 S.Ct. 1382, 1395-96, 176 L.Ed.2d 249 (2010). The Court explained that "[n]o 'clearly established' precedent of this Court supports Smith's claim that he can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Id*. at 1395. The Court stated, "This Court, furthermore, has never 'clearly established' that jury-selection-process features of the kind on Smith's list can give rise to a fair-cross-section claim." *Id*. In analyzing the third requirement in this case, therefore, the trial judge reasonably could focus on the specific jury-selection-process feature attacked by Weeks as the cause of underrepresentation.

Appellant argues that two of the distinctive groups excluded by the process were Hispanics and African-Americans. *See Aldrich*, 928 S.W.2d at 560 ("Hispanics are a distinctive group[.]"); *Feagins v. State*, 142 S.W.3d 532, 535 (Tex. App.—Austin 2004, pet. ref'd) ("African-Americans are a distinctive group[.]"). He also contends individuals with annual incomes below the poverty line are a "distinctive" group excluded from his venire. The Supreme Court noted in *Berghuis*, 130 S.Ct. at 1395 n.6, however, that the Court has never definitively decided "whether the impact of social and economic factors can support a fair-cross-section claim." *Compare Thiel v. S. Pac. Co.*, 328 U.S. 217, 219-21, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (prohibiting the deliberate exclusion of daily wage earners from jury service in federal court, and stating that prospective jurors must be selected by court officials without systematic and intentional exclusion of any economic, social, religious, racial, political and geographic groups); *see also Rivas v. Thaler*, 432 F.App'x 395, 402-03 (5th Cir. 2011) (Whether a showing of a distinct economic group would be sufficient to establish a *Duren* violation is an issue the Supreme Court has expressly reserved.); *Anaya v. Hansen*, 781 F.2d 1, 4-5 (1st. Cir. 1986) (stating that *Thiel*, decided more than thirty years before *Duren*, does not provide much "relevant guidance" in determining whether a group constitutes a 'distinct group' for purposes of a *Duren* analysis).

Weeks's primary argument assumes that those jurors who did not use the internet to respond were jurors whose income fell below the poverty line. He produced some information, apparently from the U.S. Census Bureau, of selected characteristics and activities of internet users, and some information concerning the population of Montgomery County. But the record contains no specific evidence of the income levels of individuals who have served on venires in Montgomery County, nor does the record contain evidence comparing the income levels of e-juror venires to those of the County, or to those of other venires. No one testified to explain the import of the data presented. The trial court was asked to extrapolate from an assumption, one possibly reasonable, but without supporting testimony or sufficient evidence. This Court cannot say the trial court should have found systematic exclusion of those with an annual income below the poverty line when the record before the trial court lacked sufficient evidence establishing that exclusion. On the record presented to the trial court, the trial court need not have reached the question whether individuals with annual incomes below the poverty line are a "distinctive" group for purposes of a fair-cross-section claim.

Appellant says "[a]ssuming *arguendo* that there is insufficient data that the non-e-jurors were not low-income individuals, that showing is not necessary." He cites *United States v. Jackman*, 46 F.3d 1240 (2d Cir. 1995). We understand the

12

assertion to be that, regardless of the lack of sufficient data in the record to support his primary claim of systematic exclusion based on income level, we should look at the data he submits on African-American and Hispanic representation on venires.

The record includes a study of the "Representativeness of Petit Juries" in Montgomery County. The study asked four questions:

1. Are there differences in the racial composition of juries as compared with the racial composition of the venire?
2. Are there differences in the racial composition of juries as compared with the racial composition of the county?
3. Are there differences in the racial composition of venires as compared with the racial composition of the county?
4. Are there differences in the demographic variables between those prospective jurors selected to serve and those not selected?

For purposes of a fair-cross-section analysis, the third question is most directly relevant. In response to the second and third questions, the study found no statistically significant difference for any group except Hispanics.

The conclusions of the study Weeks presented to the trial court therefore do not support his assertion that African-Americans are systematically excluded from venires in Montgomery County. Weeks says that there were no African-Americans on his venire, and he argues that there should have been at least one. But the Court of Criminal Appeals has stated that "[d]isproportionate representation in a single panel does not demonstrate the systematic exclusion of distinctive groups in

13

violation of the appellant's rights under the Sixth Amendment." *See May v. State*, 738 S.W.2d 261, 269 (Tex. Crim. App. 1987); *see also Pondexter*, 942 S.W.2d at 581.

Weeks noted in the trial court that there were only two Hispanics on the venire and he believed, apparently based on census data, that there should have been at least four. The study he relied on in the trial court indicated "a significant difference exists between the racial composition of the jury and the county and the racial composition of the venire and the county for the Hispanic group." Weeks argues that this underrepresentation is the result of the systematic exclusion of Hispanics through the e-juror selection process.

He suggests this disparity could have been easily remedied, and he requested the remedy before trial. Appellant argues essentially that those who respond in person and those who respond initially by internet should not be kept in separate "jury 'universes'" when assignments to a court are made. *See Feagins*, 142 S.W.3d at 537. But the study Weeks uses to support this claim does not refer to the e-juror response system. The study did not make any determination that the e-juror feature caused a systematic exclusion of jury-eligible Hispanics.

Instead, the study he relies on concludes:

> [D]etermining the actual expected number of persons of Hispanic descent on either the juries or the venires is problematic.

This is so for a number of reasons. First, Texas has a very substantial population of unauthorized migrants who are ineligible for jury service, but who are, nevertheless, included in census data (U.S. Census Bureau, n.d.a). (footnote omitted).

The study's authors state, at the end of a lengthy footnote: "Obviously, if up to one-third of the number of people expected to be on juries are ineligible for service, the estimates are very unstable."

The study identifies other limitations:

A limitation of the current study relates to the failure to document exemptions. . . . [I]t is not possible to differentiate between those who received the jury summons and chose not to respond from those who did not receive the summons at all. Absent these data, it is impossible to know how much of the proportion of members of different racial and ethnic groups "fall out" of the process and at which stage.

A similar limitation inheres in the number of respondents who did not answer the summons. The no-show rate in Montgomery County, as elsewhere in Texas, is known to be quite high. . . . Again, there is no way of knowing who falls out when.

A final limitation along these lines pertains to the absence of race data on who is summoned. . . .

In *Berghuis*, the Supreme Court considered a case in which an African-American was convicted by an all-white jury. Three veniremembers were African-American. After an evidentiary hearing on the defendant's fair-cross-section claim, the trial court concluded that African-Americans were underrepresented in Circuit Court venires. But the trial court held the evidence was insufficient "to prove that

15

the juror-assignment order, or any other part of the jury-selection process, had systematically excluded African-Americans." *See Berghuis*, 130 S.Ct. at 1390.

In rejecting the fair-cross-section claim, the Supreme Court explained that, "as the Michigan Supreme Court not at all unreasonably concluded," the defendant's "evidence scarcely shows that the assignment order he targets caused underrepresentation." The Court continued: "Although the record established that some officials and others in Kent County *believed* that the assignment order created racial disparities, and the County reversed the order in response [citation omitted], the belief was not substantiated by [the defendant's] evidence." *Id.* at 1394. The Court noted that the defendant produced no evidence that "African-Americans were underrepresented on the Circuit Court's venires in significantly higher percentages than on the Grand Rapids District Court's[.]" *Id*. In summary, the Court stated that the "evidence gave the Michigan Supreme Court little reason to conclude that the district-court-first assignment order had a significantly adverse impact on the representation of African-Americans on Circuit Court venires." *Id.* at 1395.

As was the case in *Feagins*, Weeks offered insufficient evidence "of what percent of *eligible jurors* in the county" are members of the distinctive groups. *See Feagins*, 142 S.W.3d at 537. In *United States v. Torres-Hernandez*, 447 F.3d 699,

16

701 (9th Cir. 2006), the court concluded that "a district court need not and may not take into account Hispanics who are ineligible for jury service to determine whether Hispanics are underrepresented on grand jury venires." In that case, the court held that "to determine whether Hispanics are underrepresented to an unconstitutional degree in venires, a district court must rely on that evidence which most accurately reflects the judicial district's actual percentage of jury-eligible Hispanics." *Id.* There, the trial court had that evidence. *See id.* at 701-02; *compare Feagins*, 142 S.W.3d at 537. On this record, however, the trial court could reasonably find that Weeks failed to present sufficient evidence to support his claim that the specific jury-selection-process feature he targeted violated his Sixth Amendment right to an impartial jury. Issue two is overruled.

CLOSING ARGUMENT

Weeks maintains that the trial court erred in overruling his objection to a closing argument made by the prosecutor. During the arguments, appellant's counsel compared the Intoxilyzer machine to a fictitious "Taxilyzer" machine that he mentioned during voir dire. Appellant's counsel stated, as a hypothetical, that he worked for a tax department and was attempting, through use of the "Taxilyzer 5000" machine, trying to determine who lied on his or her taxes. In the hypothetical, he would identify an expensive vehicle parked outside an apartment

17

complex, locate the vehicle's owner, request a W-2 form, and feed it into the machine. If the machine said the person did not pay enough taxes, he would throw him in jail and fine him. Appellant's counsel then asked the veniremembers if they would allow him to run their W-2 forms through a machine that they knew little about, that used outdated technology, that had a twenty percent acceptable range of error and checked itself, and that had been recalled in other states.

In closing argument, appellant's counsel stated that he would not trust the results from the Intoxilyzer. He questioned the reliability of the Intoxilyzer and referred back to the fictitious "Taxilyzer" he imagined during voir dire. He argued:

> Ladies and gentlemen of the jury, I talked to you about this Taxilyzer. All of y'all told me heck no. I'm not giving you my W-2. You wouldn't have given me your W-2 if you were faced with jail and a fine. I got inherent problems with this Intoxilyer that was made in the 1980s.

The prosecutor responded:

> And what better thing could you say that people would hate than something to do with taxes? It made sense to me after I thought about [it]. That's probably what I would say in order to get you to hate something.

Weeks objected on the basis that this was an attempt by the prosecutor to strike at Weeks "over the shoulder" of counsel. The trial court overruled the objection. The prosecutor continued his closing argument:

And if you go back there and you are thinking about taxes, maybe you will hate this instrument too. But unfortunately, for them, this thing has nothing to do with taxes. It has everything to do with science. It was operating properly that day. Take a look at the test slips. You will see that it was maintained properly and operating properly and came out with a .14.

Generally, proper jury argument falls within one of four areas: summation of the evidence, reasonable deduction from the evidence, answer to argument of opposing counsel, and plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). A prosecutor risks improperly striking at a defendant "over the shoulder" of counsel when an argument refers to defense counsel personally and when the argument explicitly impugns defense counsel's character. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). The prohibition protects the defendant from improper character attacks on defense counsel. *Davis v. State*, 268 S.W.3d 683, 713 (Tex. App.—Fort Worth 2008, pet. ref'd) (citing *Coble v. State*, 871 S.W.2d 192, 205 (Tex. Crim. App. 1993)). Weeks maintains that the argument was improper because it injected facts not in evidence and invited the jury to speculate that Weeks "labored behind the scenes to persuade the jury that they should 'hate' the State's evidence."

The prosecutor's statements were in response to defense counsel's attack throughout the trial on the reliability of the Intoxilyzer. The prosecutor's response was not a personal attack but was instead an answer to an assertion by opposing

counsel. *See Mosley*, 983 S.W.2d at 258-59; *Davis*, 268 S.W.3d at 713. The prosecutor responded to a specific argument about an imaginary "Taxilyzer" introduced by defense counsel. *See Brown*, 270 S.W.3d at 570. Under the circumstances, the trial court judge could reasonably consider the prosecutor's argument as within the scope of permissible response. Issue three is overruled.

Having reviewed the record and the issues raised, we see no error by the trial court that would justify reversal of the court's judgment. *See* Tex. R. App. P. 44.2. The judgment is therefore affirmed.

AFFIRMED.

_____
DAVID GAULTNEY
Justice

Submitted on October 25, 2012
Opinion Delivered March 13, 2013
Publish

Before McKeithen, C.J., Gaultney and Kreger, JJ.