

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00377-CR

**BRETT SHANE ARNOLD,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the County Court at Law No. 1**
**Brazos County, Texas**
**Trial Court No. 12-00333-CRM-CCL1**

## MEMORANDUM  OPINION

Appellant Brett Shane Arnold and three other men were canoeing and kayaking on the Navasota River.  When they returned to where they had parked their vehicles, Game Warden Leanne Winkenwerder was there and conducted a safety inspection to determine if they had life jackets and then conducted an inspection to determine if they had been illegally fishing or hunting.  During the inspection, Warden Winkenwerder located a substance that she suspected was marijuana, and she arrested Arnold for misdemeanor possession of marijuana.

Arnold filed a pretrial motion to suppress the marijuana. After an evidentiary hearing in which Arnold represented himself, the trial court denied the motion to suppress. Arnold then represented himself at trial, and the jury found him guilty of misdemeanor possession of marijuana (less than two ounces) and assessed a sentence of 14 days in the county jail and a $1,000 fine.

Arnold's counsel on appeal asserts two issues pertaining to Arnold's motion to suppress: that Warden Winkenwerder exceeded her authority by further inspecting his canoe after she had conducted her water-safety inspection, and that Warden Winkenwerder's search of the cooler lacked probable cause and was an unreasonable search under the Fourth Amendment.

**Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). We give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor; and on (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673. But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Id.*

When reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). The trial judge is the exclusive fact-finder and the judge of the credibility of the witnesses and the weight to be given their testimony at the suppression hearing. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When the trial court does not make express findings of fact, an appellate court must "presume that the trial court implicitly resolved all issues of historical fact and witness credibility in the light most favorable to its ultimate ruling." *State v. Elias*, 339 S.W.3d 667, 674 (Tex. Crim. App. 2011). An appellate court will sustain the trial court's decision if it concludes that the decision is correct on any theory of law applicable to the case. *Ross*, 32 S.W.3d at 855-56.

In cases in which the trial court is never asked to exercise its discretionary authority to reopen the suppression hearing, appellate review of the trial court's ruling on the motion to suppress is ordinarily limited to that evidence presented at the pretrial hearing—the evidence that was before the court at the time of its decision. *Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012). But if the parties consensually broach the suppression issue again before the fact-finder at trial, the reviewing court should also consider the evidence adduced before the fact-finder at trial in gauging the propriety of the trial court's ruling on the motion to suppress. *Id.* Although Arnold did not request the trial court to reconsider its ruling on his motion to suppress, the suppression issues were relitigated at trial. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). Accordingly, in reviewing the propriety of the trial court's ruling on the motion to

suppress, we will consider not only the evidence presented at the suppression hearing, but also the evidence presented at trial. *See Black*, 362 S.W.3d at 635; *Rachal*, 917 S.W.2d at 809.

**The Evidence**

At the suppression hearing, Warden Winkenwerder testified that she stopped at a parking area next to the Navasota River because she noticed several vehicles parked there. She spotted a fisherman who turned out to not have a fishing license and who also had an outstanding warrant. That arrest, with the help of the sheriff's office, took around an hour, and the vehicles' still being parked there meant to Warden Winkenwerder, based on her training and experience, that somebody was either on the river fishing or kayaking or in the woods hunting.

She began to walk toward the vehicles, and at that time the canoe and kayak with four people total were pulling in. Warden Winkenwerder's intention was to check their watercraft for wildlife resources if they had been fishing or hunting and to check their water-safety gear (life jackets) if they were only kayaking. She first checked for life jackets for everyone and then asked what they had been doing out on the water. They said they were "having a good time." Warden Winkenwerder also testified that while there were no fishing poles in the canoe or kayak, people fish on the river with trotlines and droplines (a line with a hook and is tied to a tree limb over the river). She also said that a "dry box" that was in the canoe could be a tackle box. The canoe also had a backpack and other outdoor gear. One of the four told her that they had been looking for turtle

shells and turtle eggs, all of which are regulated except for one species (the red-eared slider).

While scanning the canoe and kayak, Warden Winkenwerder noticed a cooler and thought it might have fish or bait in it, so she opened the lid but Arnold slammed the lid down. That indicated to her that "something is going on." Also, she had glanced into the cooler when the lid was up and had noticed an orange pill bottle. She opened up the cooler and noticed that the orange pill bottle appeared to contain a green, leafy substance. She took out the orange pill bottle and opened it, and inside it was a green, leafy substance that she suspected might be marijuana. When she smelled it, she determined that it was in fact marijuana.

On cross-examination, Warden Winkenwerder said that any container or receptacle could be equipment for hunting or fishing. She then quoted section 12.102(b)(4) of the Texas Parks and Wildlife Code, which pertains to the inspection of wildlife resources and which provides that a game warden may inspect "the contents of any container or receptacle that is commonly used to store or conceal a wildlife resource." She added that a cooler is commonly used to store baitfish for fishing or turtle shells or turtle eggs, but she admitted that she did not see the four men hunting or fishing or have a report that they had been hunting or fishing.

Warden Winkenwerder also admitted that she had never seen Arnold fishing with a trotline before on that river, but she explained that she checks "a lot of people" whom she has never seen before for fishing: "if you are on the river and you have a container, receptacle, it is my job and duty to check the person out and their receptacles, [and] see

if there's game or wildlife resources taken. That's what I'm trained to do."

Arnold testified that he was training that day for the Texas Water Safari, which is a four-day trip, with three other people. When they got to the shore,

> The game warden came up to us agitatedly and was yelling, but she had said that she was there to stop somebody else and she had been waiting there for two hours. And I said, "Well, that's not us, so we can go." And she said, "No, I'm going to do a water safety check." And the life jackets are clearly visible, and I knew that that was the only thing that was the only thing required, so again, "Am I free to go?"

> And, um, then she started asking us whether we had anything illegal on the boat, drugs, alcohol - - I don't know - - drugs I remember, but, um - - and then she started looking into our stuff. Um, there is one point that I recollect that, um, I'm not sure if she does; but when she was asking us about "Is there anything in your cooler," I opened the cooler and I looked in there and I closed the lid and that's when she came up to start looking through my cooler. And I didn't know anything was in the cooler, just didn't know it was in there.

Arnold also said that he told Warden Winkenwerder that she did not have permission to search his boat. On cross-examination, Arnold admitted that he had told Warden Winkenwerder that they had collected turtle shells, and he added that what they had originally thought were turtle eggs were actually white gourds that had fallen from trees into the river. He said that he had about fifteen bags of gear in his canoe.

At trial, Warden Winkenwerder reiterated much of the above testimony. For example, she said that Arnold told her that they were "kayaking and canoeing and having a good time on the river." He also told her that they were looking for turtle eggs. Warden Winkenwerder said that the river was "fishable" and added that one can fish on the river with a net. She also reiterated that a cooler is "fishing equipment" and described the cooler as a "receptacle."

She admitted that even a cigarette pack can be fishing equipment because it can contain a hook, and she could not remember if she asked the four for fishing licenses. Warden Winkenwerder also agreed that she did not find any fishing poles, fishing line, bait, nets, hooks, or fish in the canoe or kayak. She also did not find any turtles or turtle eggs, or any wildlife resources at all.

## Applicable Law

Section 31.124(a) of the Texas Parks and Wildlife Code authorizes an enforcement officer to "stop and board any vessel subject to this chapter" and to "inspect the boat to determine compliance with applicable provisions." TEX. PARKS & WILD. CODE ANN. § 31.124(a) (West 2002). Section 12.102(b)(4) of that Code provides that a game warden who "reasonably believes that a person is or has been engaged in an activity regulated by this code" may inspect "the contents of any container or receptacle that is commonly used to store or conceal a wildlife resource." *Id.* § 12.102(b)(4) (West Supp. 2014). And section 12.104(a) provides that a game warden "may search" a "receptacle" if the game warden "has a reasonable, articulable suspicion that the … receptacle contains a wildlife resource that has been unlawfully killed or taken." *Id.* § 12.104(a) (West 2002).

## Discussion

Arnold argues that Warden Winkenwerder exceeded her statutory authority by further inspecting his canoe after she had conducted her water-safety inspection. He also argues that, despite the statutory authorizations for game-warden searches, Warden Winkenwerder's search of the cooler lacked probable cause and was unreasonable under the Fourth Amendment. The State argues that Warden Winkenwerder's search of the

cooler was legal under the Fourth Amendment and Sections 12.102 and 12.104 because she had reasonable suspicion that Arnold had been fishing.

Arnold does not dispute the propriety or legality of Warden Winkenwerder's water-safety inspection or check under section 31.124(a). *See Schenekl v. State,* 30 S.W.3d 412 (Tex. Crim. App. 2000) (upholding constitutionality of safety inspections under section 31.124(a) without probable cause or reasonable suspicion). "[I]f reasonable suspicion develops during a safety and regulatory compliance inspection under Chapter 31, a warden may briefly detain the suspect further for investigative purposes." *Weeks v. State,* 396 S.W.3d 737, 741 (Tex. App.—Beaumont 2013, pet. ref'd).

Warden Winkenwerder articulated the following reasons for suspecting that Arnold and his companions might have been fishing:

- Because she had been at the scene where their vehicles were parked for over an hour, based on her experience, the persons had been on the river for at least that long and could have been fishing.

- While no fishing poles were visible, trot lines, drop lines, and nets can be used to fish on the river.

- One of the members of Arnold's party mentioned that they had collected turtle shells or eggs on the river.

- There was a cooler in the canoe, and a cooler can be used to store bait or caught fish.

- Because she thought the cooler might have fish or bait in it, she opened the lid to see, and Arnold slammed the cooler lid shut.[1]  That indicated to her that "something is going on."  She reopened the cooler and grabbed the orange pill bottle and another bottle.

---

[1] Arnold testified that Warden Winkenwerder asked if anything was in the cooler.  He said that he then opened the lid, looked in the cooler and closed the lid, and then she opened it and looked through it.

The trial court denied Arnold's motion to suppress; therefore, we must view the evidence in the light most favorable to the trial court's ruling. *Kelly*, 204 S.W.3d at 818. The trial judge was the exclusive fact-finder and the judge of the credibility of Arnold and Warden Winkenwerder as witnesses and the weight to be given their testimony at the suppression hearing. *Ross*, 32 S.W.3d at 855. Because the trial court did not make express findings of fact, we must "presume that the trial court implicitly resolved all issues of historical fact and witness credibility in the light most favorable to its ultimate ruling." *Elias*, 339 S.W.3d at 674.

In light of the standard of review, we cannot say that the trial court abused its discretion in denying Arnold's motion to suppress with its implied conclusion that the search of the cooler was reasonable. The evidence supports the implied findings that Warden Winkenwerder reasonably believed that Arnold had been fishing or hunting (turtles) and that she had a reasonable, articulable suspicion that Arnold's cooler was a receptacle containing a wildlife resource that had been unlawfully killed or taken. *See* TEX. PARKS & WILD. CODE ANN. §§ 12.102(b)(4), 12.104(a). We overrule Arnold's two issues and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed June 18, 2015
Do not publish
[CR25]

