**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-19-00138-CR**

**GERALD CHRISTOPHER KRONENTHAL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Court at Law No. 1**
**Montgomery County, Texas**
**Trial Cause No. 18-331550**

---

**MEMORANDUM OPINION**

Appellant Gerald C. Kronenthal was charged by information for the offense of boating while intoxicated. *See* Tex. Penal Code Ann. § 49.06. A jury found Kronenthal guilty of the offense charged, and the court assessed punishment at three days in county jail and a fine of $1000. In two issues, Kronenthal challenges his conviction. For the reasons outlined below, we affirm.

The State called Game Warden Robert Apple ("the Game Warden"), as a witness at trial. The Game Warden testified that his training at the game warden academy included water safety violations, boating while intoxicated, water safety inspections, and standardized field sobriety tests. The Game Warden agreed that he was certified in standardized field sobriety testing, including the HGN test, and he received training in Advanced Roadside Impairment Detection Enforcement and the "seated battery of standardized field sobriety tests[.]" According to the Game Warden, a water safety inspection includes checking registration and life jackets, but he looks "for everything" including intoxication during a water safety stop. The Game Warden testified that he does about twenty-five water safety inspections a day, of which "maybe ten[]" include some investigation of alcohol use.

The defense made an objection stating that the Game Warden was about to testify about certain field sobriety tests that were not standardized, validated, or certified but were going to be offered as probable cause to detain Kronenthal onshore. The defense argued that the non-standardized tests were "junk science[]" that did not meet the *Kelly*[1] standard and evidence of the tests should not be admissible.

---

[1] *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) ("As a matter of common sense, evidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case: (a) the underlying scientific

The trial judge dismissed the jury and allowed a suppression hearing outside the presence of the jury. On voir dire, the Game Warden testified that on the day of the incident, he approached a boat operated by Kronenthal and announced he was going to do a water safety inspection. The Game Warden testified that he observed two aluminum beer bottles on the boat and that Kronenthal did not seem to be concentrating on what he was doing when he was pulling out life jackets for the inspection. The Game Warden testified that he asked Kronenthal if he had been drinking, and Kronenthal replied that he had consumed "like one beer that day." The Game Warden thought it was "a little odd" that Kronenthal did not give a definite number. At that point, the Game Warden requested that Kronenthal say the alphabet without singing, but Kronenthal sang it, and the Game Warden instructed him to restart. The Game Warden testified that he believed that Kronenthal also said "X" instead of "S." According to the Game Warden, he then instructed Kronenthal to count backwards from 37 to 17, and when counting Kronenthal said "29" instead of "19." The Game Warden further testified that Kronenthal did not speed up as instructed during a finger-count test. At that point, the Game Warden believed that Kronenthal could have been intoxicated based on Kronenthal's admission that he had been drinking beer and how Kronenthal had performed on the tests. The Game

theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question.").

3

Warden then tried to get Kronenthal to perform the HGN test, and Kronenthal requested that they go to shore because he had a knee problem. According to the Game Warden, at this point Kronenthal was detained on the suspicion of boating while intoxicated based on Kronenthal's admission and performance on three tests.

According to the Game Warden, when they were on land, he administered the horizontal gaze nystagmus (HGN), finger-to-nose, palm-pat, and hand-coordination tests, and the Game Warden agreed that these are contained in the seated battery of standardized field sobriety tests that he was certified by the National Association of State Boating Law Administrators (NASBLA) to conduct. The Game Warden testified that the alphabet and counting tests were not part of the NASBLA battery of tests. According to the Game Warden, the HGN test in the NASBLA battery is the same as in the NHTSA testing and the other tests are comparable to the NHTSA tests. The Game Warden testified that he did not give the NHTSA walk-and-turn or one-leg-stand tests when they were on land because Kronenthal had a knee injury and because the boat ramp did not have a good, smooth surface.

The State played a recording from the Game Warden's body camera. During the playback, the Game Warden pointed out two beer cans on the boat. The playback of the body camera recording included the HGN test. According to the Game Warden, Kronenthal displayed four clues during the HGN test, but upon watching the playback, the Game Warden believed that Kronenthal displayed additional clues.

4

The Game Warden testified that he was aware that NASBLA had done research on the seated battery, but he did not know whether a control group was used. The Game Warden also understood that the battery had been validated by the Southern California Research Institute. According to the Game Warden, the palm-pat and hand-coordination tests were "comparable[]" to the HGN, walk-and-turn, and one-leg-stand tests and that overall, the seated battery of tests was comparable to the standardized field sobriety tests. At this point, the court denied Kronenthal's motion to suppress. The jury was called back into the courtroom and the trial continued.

The Game Warden testified that on May 12, 2018, he was patrolling Lake Conroe for water safety violations. He signaled the boat for a random water safety inspection, and he initially had no reason to suspect criminal activity. He testified that Kronenthal, who had been driving the boat, pulled out lifejackets and throwables until the Game Warden asked him to stop. Upon the Game Warden's request, Kronenthal asked a man sitting in the front of the boat to show the fire extinguisher and a horn or whistle, and Kronenthal produced the boat's certificate number and registration, but Kronenthal did not sound the horn or show a whistle. According to the Game Warden, he requested two things at once to observe concentration, focus, and mental impairment. Based on how Kronenthal responded, the Game Warden suspected that he might be intoxicated, and he also observed two beer cans and an

5

ice chest in the back of the boat. The Game Warden testified he asked Kronenthal if he had consumed any alcohol that day, and Kronenthal replied "like one beer[,]" and the Game Warden thought this indefinite response was odd. The Game Warden asked Kronenthal if he felt intoxicated, and he said "[n]o."

The Game Warden testified that "float tests" are simple tests for signs of intoxication that include saying the alphabet without singing, counting backwards from 37 to 17, and a finger-count test. According to the Game Warden, Kronenthal sang the alphabet and stopped and restarted, and he thought he heard Kronenthal say "X" instead of "S." He then asked Kronenthal to count backwards from 37 to 17, and Kronenthal said "29" instead of "19" and then corrected himself. The Game Warden testified that Kronenthal did not perform the finger-count test as instructed. The Game Warden next asked Kronenthal to step over to the Game Warden's boat and do the HGN test, but, pointing to a scar on his knee, Kronenthal said he was not able to step over from his boat to the Game Warden's boat, and the Game Warden allowed Kronenthal to drive his boat to the dock, which was 50 to 100 yards away.

Upon arrival at the shore, the Game Warden tried to perform the HGN test, but he had to start over several times because Kronenthal was unable to stay focused on the stimulus for the whole test. After five attempts, the Game Warden was able to complete the HGN test, he observed four clues for intoxication, and he was starting to believe that Kronenthal was intoxicated.

6

The Game Warden administered the seated sobriety tests because Kronenthal had a knee injury and was not wearing shoes, and because the surface was gravel and not flat. The Game Warden testified that the seated tests included a finger-to-nose test, a palm-pat test, and a hand coordination test that is similar to the walk-and-turn test but done with fists, and he regarded the seated tests as "comparable" to the standing tests and effective in determining whether someone is intoxicated. He also thought Kronenthal's time perception was "a little bit off." The Game Warden testified that he observed ten of forty-eight possible clues in the finger-to-nose test, and nine or more clues on this test suggest intoxication. The Game Warden then testified that on the palm-pat test, two or more clues suggest intoxication and he observed three clues when Kronenthal performed the test. According to the Game Warden, he was not able to administer the hand-coordination test because Kronenthal was unable to complete the test without stopping for validation.

According to the Game Warden, Kronenthal had difficulty thinking and "seemed to have trouble functioning or following simple instructions." The Game Warden also thought it was a clue when Kronenthal was unable to follow instructions and lacked sufficient attention to perform the hand coordination test. The Game Warden offered Kronenthal a portable breath test, but Kronenthal was unable to give a good enough sample. Taking everything into consideration, the

Game Warden believed that Kronenthal was intoxicated, and he decided to arrest Kronenthal. The Game Warden testified:

> . . . I gave him every test I had available to me. If he was not intoxicated, he wouldn't have had as much issues with those tests. You know, the [portable breath test], it's pretty simple. I mean, you just blow for a few seconds, but he wasn't doing it the way I instructed him to on either test. He struggled with instructions on all of them.

The Game Warden advised Kronenthal of his *Miranda* rights and transported him to the lake office and requested a blood sample, Kronenthal refused to provide a sample, and the Game Warden read Kronenthal the statutory warning for refusing to provide a blood sample. The Game Warden then took Kronenthal to the county jail and applied for a warrant for a blood sample. According to the Game Warden, on the way to the jail,

> The Defendant continued to ask me why I thought he was intoxicated, questions like that. I could still smell the alcohol on him. Actually a little bit better since we were in the closed cab of the truck. The whole time he kept questioning the tests I had given him and kind of telling me he was not intoxicated.

The Game Warden also noticed that Kronenthal's eyes were bloodshot, watery, and red. After obtaining a warrant, the Game Warden took Kronenthal to the jail infirmary for a blood draw. Following the blood draw, the Game Warden booked Kronenthal into the jail, took the vials of blood to a refrigerator in the evidence locker, and later mailed the blood to the DPS crime lab in Houston.

8

The Game Warden agreed that he was wearing a body camera throughout the incident. The Game Warden recognized State's Exhibit 4 as a disk containing the video from his body camera, and the exhibit was admitted into evidence and published to the jury.

On cross-examination, the Game Warden testified that during the safety inspection he "had to ask for the horn twice [and Kronenthal] didn't seem to be paying attention to what he was doing when he was pulling out the lifejackets." The Game Warden also agreed that he did not inventory Kronenthal's boat or trailer, and he did not look in the cooler or in a mug on the boat but that Kronenthal "admitted he consumed alcohol[,]" he detected a faint smell of alcohol on Kronenthal, but he could not recall when he smelled alcohol. The Game Warden agreed he did not think Kronenthal had significantly slurred speech.

When asked by defense counsel whether the alphabet test had been validated, the Game Warden responded "It's a valid test. It was included in the 1990 Coast Guard test as one of the tests they use." And the Game Warden agreed that the alphabet counting-backwards, and finger-count tests were not standardized, but that he had learned these tests when he took refreshers for the standardized field sobriety tests. He also testified that the finger-to-nose, palm-pat, and hand-coordination tests were standardized and were designed for boating.

Other Evidence

Eric Ho, a forensic scientist at the Texas Department of Public Safety crime lab in Houston, testified that he analyzes evidence related to controlled substances and blood alcohol received by law enforcement agencies. Ho identified State's Exhibit 7 as the evidence that was submitted in this case and State's Exhibit 9 as his report on his analysis of the evidence. Ho testified that based on his analysis, he concluded that the blood evidence contained "0.121 plus or minus .006 grams of alcohol per 100 milliliters of blood at 99.7 percent confidence level." On cross-examination, Ho testified that he could not say beyond a reasonable doubt that Kronenthal's blood alcohol content was above 0.08 while he was boating because such retrograde extrapolation required additional facts that Ho did not have.

Casey Christman testified that she was with Kronenthal and Paul Adey on the day in question. Christman did not see Kronenthal drink anything more than one beer but she recalled that he also had "a couple sips" from her drink and Adey's. Christman also testified that she did not remember everything about the day in question. In addition, Christman testified that she had seen Kronenthal on other occasions when he was intoxicated.

Paul Adey testified that he did not remember seeing Kronenthal drink more than one beer on the day in question. Adey agreed that he had seen Kronenthal intoxicated on a few occasions but that Kronenthal "doesn't drink too much[,]" and

he did not believe that Kronenthal was intoxicated on May 12, 2018. Adey agreed that he was doing the "majority of the drinking" that day on the boat, and he was surprised to learn that Kronenthal's blood alcohol level had tested at .12.

At the conclusion of the State's case in chief, the defense moved for a directed verdict, arguing that the Game Warden had not testified that he was water safety certified and requested that the court rule on its motion to suppress "that this was a bad stop[.]" The court denied the motion. The defense also reurged its motion to suppress, arguing that the blood evidence did not show that Kronenthal's blood alcohol level was .08 at the time of driving, which the court denied.

Issues

Appellant's first issue argues that the trial court abused its discretion in denying his motion to suppress because his detention and arrest were not supported by reasonable suspicion or probable cause. Appellant's second issue argues that the various intoxication tests the Game Warden used did not meet the standards required of scientific tests for admissibility under Rules of Evidence 403 and 702 and *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

Certain volumes of the reporter's record in this case are titled "Excerpted Testimony[.]" Where an appellant requests a partial reporter's record for appeal, the appellant must include a statement of the points or issues to be presented on appeal and is limited to those points or issues. *See* Tex. R. App. P. 34.6 (c). In this case, the

record does not reflect that the Appellant filed a statement of points or issues to be presented on appeal. Therefore, we presume the omitted portions of the reporter's record are relevant and support the trial court's judgment. *See Zavala v. State*, 498 S.W.3d 641, 642 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing *Gray v. State*, 853 S.W.2d 782, 783-84 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (applying former version of Rule 34.6); *Burks v. State*, 904 S.W.2d 208, 210 (Tex. App.—Fort Worth 1995, no pet.) (same)).

Objections Raised at Trial

Appellant argues in his appellate brief that the basis for his verbal motion to suppress at trial was that "Kronenthal was detained and subsequently arrested without reasonable suspicion or probable cause, violating his Fourth Amendment rights." The State argues that Appellant did not preserve error on this issue because at trial, Appellant did not seek to suppress the fruits of the float tests on the basis that the Game Warden lacked reasonable suspicion but rather because the tests are not standardized or validated. The appellate record does not indicate Kronenthal filed a written motion to suppress before trial. Therefore, we are limited to the arguments he made at trial.

Before the Game Warden testified about the float tests, the defense objected as follows:

> These aren't standardized tests. They haven't been validated, certified. Nothing. And that's going to be his probable cause to pull him from the

12

boat to the shore. And we would object, unless he can somehow prove these up, that they've been validated like the certified standardized field sobriety tests.

Elsewhere, defense counsel stated to the trial court that "this is not really a suppression motion because you don't need a reason to stop the boat. . . . It's [a] safety inspection, but you do need a reason to detain somebody and bring them to the shore." The objection made by the defendant to the trial court was that the "float tests" are unscientific under the *Kelly* standards. We conclude that the objection made on appeal does not comport with the objection made at trial. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *see also* Tex. R. App. P. 33.1. That said, even assuming the Appellant's argument preserved error for appeal, we find no error by the trial court, as explained below.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *see also Scott v. State*, 572 S.W.3d 755, 759-760 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (applying the same bifurcated-review standard in reviewing an oral motion to suppress). We review the trial court's factual findings for an abuse of discretion but review the trial court's application of the law to the facts de novo. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013).

At a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony, and a trial

13

court may choose to believe or disbelieve all or any part of a witness's testimony. *Valtierra*, 310 S.W.3d at 447; *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007) (quoting *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999)); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When reviewing a trial court's ruling, the appellate court does not engage in its own factual review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We give almost total deference to the trial court's determination of historical facts, "especially if those are based on an assessment of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We give the same deference to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). We review purely legal questions de novo as well as mixed questions of law and fact that do not turn on credibility and demeanor. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011); *Crain*, 315 S.W.3d at 48.

A game warden needs no individualized suspicion to stop and board a boat to conduct a water safety inspection. *See Schenekl v. State*, 30 S.W.3d 412, 415-16 (Tex. Crim. App. 2000). Appellant concedes that the initial stop for a safety check was authorized under section 31.124 of the Texas Parks and Wildlife Code. *See* Tex. Parks & Wildlife Code Ann. § 31.124 ("Inspection of Vessels" under which "an enforcement officer may stop and board any vessel subject to this chapter and may

14

inspect the boat to determine compliance with applicable provisions[]"). A law enforcement officer "has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). If reasonable suspicion develops during a safety check performed pursuant to section 31.124, a game warden "may briefly detain the suspect further for investigative purposes." *See Weeks v. State*, 396 S.W.3d 737, 741 (Tex. App.—Beaumont 2013, pet. ref'd). Investigative detentions are generally governed by the reasonable suspicion standard. *See York v. State*, 342 S.W.3d 528, 536 (Tex. Crim. App. 2011) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Crain*, 315 S.W.3d at 52). And an officer needs only a "minimal level of objective justification" to briefly continue a detention. *See Foster v. State*, 326 S.W.3d 609, 613 (Tex. Crim. App. 2010).

In *Weeks*, we concluded that the game warden had reasonable suspicion to justify further investigative detention for "boating while intoxicated" where the warden observed the defendant operating a boat, the defendant had difficulty complying with requests during a water safety inspection, and the game warden smelled alcohol on the defendant. *See* 396 S.W.3d at 741-42. Similarly, in this case, during a water safety inspection of the boat Kronenthal was operating, the Game

15

Warden observed that Kronenthal pulled out more flotation devices than there were people on board the vessel and he failed to sound the horn or show a whistle. The Game Warden also observed beer cans and an ice chest on the vessel. Upon being asked if he had been drinking, Kronenthal admitted he had had "like one beer[]" and the Game Warden regarded the response as odd. The Game Warden then administered the float tests, including the alphabet, counting-backwards, and finger-count tests. The Game Warden observed that Kronenthal had problems performing the tests as instructed: he sang the alphabet contrary to instructions; he said "X" instead of "S" when giving the alphabet; in counting backwards, he stated "29" instead of "19"; and he could not complete the finger-count test. At that point, the Game Warden had observed several signs of possible intoxication.

The Game Warden then asked Kronenthal to come to shore with him, where the Game Warden administered a seated battery of field sobriety tests, including the HGN, finger-to-nose, palm-pat, and hand-coordination tests. The Game Warden agreed that these tests comprise the seated battery of standardized field sobriety tests that he was certified by the NASBLA to conduct and that the alphabet and counting tests were not part of the NASBLA battery of tests. The Game Warden also testified that the HGN test in the NASBLA battery is the same as in the NHTSA testing and the other tests are comparable to NHTSA tests. In addition, the Game Warden

testified that NASBLA had done research on the seated battery and that the battery had been validated by the Southern California Research Institute.

Even without the sobriety tests, the Game Warden had reasonable suspicion based on articulated facts that an offense was in progress or had occurred based on Kronenthal's difficulty following instructions, his admission to drinking "like one beer[,]" and the presence of more than one empty beer container on the boat. *See Martinez v. State*, 500 S.W.3d 456, 465 (Tex. App.—Beaumont 2016, pet. ref'd); *Weeks*, 396 S.W.3d at 741-42. On this record, we conclude that based on the totality of the circumstances, an objectively reasonable officer would have developed reasonable suspicion that an offense was in progress or had occurred and the trial court did not err in overruling Kronenthal's motion to suppress. *See Derichsweiler*, 348 S.W.3d at 914; *Martinez*, 500 S.W.3d at 465; *Weeks*, 396 S.W.3d 737, 741-42. We overrule Appellant's first issue.

Admission of Evidence of Field Sobriety Tests

In Appellant's second issue, he contends that the trial court erred in admitting evidence of "alternate, not-validated[] tests of intoxication over Mr. Kronenthal's objection under Rule 702." Appellant's brief states that the tests the Game Warden used and testified about "did not meet the standards required of scientific tests for admissibility under Rules 702, 403, and *Kelly*." In particular, Appellant challenges

admission of evidence relating to the alphabet test, the finger-count test, the seated HGN, the finger-to-nose test, the palm-pat test, and the hand-coordination test.

Appellant appears to concede that the HGN test "is recognized as scientifically valid or promulgated by NHTSA for use in the investigation and arrest of suspected intoxicated drivers." At trial, the defense objected to testimony concerning "an ABC, a counting test, and a finger count test[]" because these field sobriety tests were not standardized, validated, or certified and for which there are no standardized clues, as contrasted with the field sobriety tests standardized by the National Highway Traffic Safety Administration (NHTSA), a government organization. Defense counsel also objected to the "seated floating tests" under *Kelly.* Accordingly, we restrict our analysis herein to the float tests (alphabet, counting test, and finger-count tests) because Appellant's objection at trial was limited to these tests. *See* Tex. R. App. P. 33.1. The court stated that the defense arguments go to the weight of the evidence and not admissibility and that some simple tasks could show signs of impairment and because they are not "scientific tests[,]" they would not be subject to the *Kelly* or *Daubert* standards.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702.

18

"[O]bservations which do not require significant expertise to interpret and which are not based on a scientific theory can be admitted as lay opinions if the requirements of Rule 701 are met."[2] *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). When an officer's administration of field sobriety tests is based on observations grounded in common knowledge "that excessive alcohol consumption can cause problems with coordination, balance, and mental agility," the officer's testimony based on these observations is considered lay witness opinion testimony under Rule 701 and not expert testimony under Rule 702. *See Plouff v. State*, 192 S.W.3d 213, 223-24 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (addressing the one-leg-stand and walk-and-turn tests); *see also Emerson v. State*, 880 S.W.2d 759, 763 (Tex. Crim. App. 1994) (explaining that a police officer may generally offer lay opinion testimony to prove a defendant's intoxication) (citing *Vaughn v. State*, 493 S.W.2d 524, 525 (Tex. Crim. App. 1972)).

Appellant cites to *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) for factors a court should consider in determining reliability. However, *Kelly* addressed the reliability of "evidence derived from a scientific theory[.]" *Id.* Appellant's brief argues that the "alternative tests" about which the Game Warden

---

[2] "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." Tex. R. Evid. 701.

19

testified "are generally not considered to be scientific." The record does not indicate that the State offered evidence of the float tests as "scientific" evidence. The prosecutor told the court:

> [T]hese tests that [the defense] has objected to [] *Kelly* does not apply to this because it doesn't require an expert witness to talk about them. The observations that you would make, the clues that you would get from them, don't come from any sort of standardized or scientific analysis. It just comes from the common knowledge that he as a law enforcement officer has. It's really a lay opinion, if anything.

The Game Warden testified:

> . . . it's kind of like [] the "mom" test. When you came home as a teenager, you know, mom is going to look at you, smell you, [] listen to you, [] just to see what you might have been doing that night. So these are simple tests. There's really no set clues, [] per se, like so many clues you're an intoxicated person; but you're looking for [] clues that [] this person might be intoxicated.

The court concluded that the alternate float tests were "simple tasks that could show some sort of impairment[,]" were "anybody-can-do-it tests[,]" and were not scientific tests that required application of *Kelly* or *Daubert* standards.

We cannot say the trial court erred in concluding that the Game Warden's testimony about the float tests was admissible. The Game Warden's testimony was based in part on his observations of Kronenthal's response to tasks that could show impairment. The Game Warden's testimony of his observations and his testimony about the basis for his belief that Kronenthal was intoxicated after he administered the tests would have been admissible as lay witness opinion testimony under Rule

20

701. *See Emerson*, 880 S.W.2d at 763; *Plouff*, 192 S.W.3d at 223-24. Alternatively, to the extent that the Game Warden testified as an expert, the record reflects that he did so based on his knowledge, skill, experience, and training as a Game Warden and law enforcement officer, and his testimony would have been admissible under Rule 702. *See* Tex. R. Evid. 702. Rule 702 does not require that a witness's specialized knowledge be scientific. *See id.* We conclude that the trial court did not abuse its discretion by admitting this testimony. *See Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007) (explaining that a trial court's ruling on the admission of evidence is reviewed for abuse of discretion).

But even assuming without deciding that the complained-of evidence was erroneously admitted, we apply the standard for nonconstitutional error contained in Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Melgar v. State*, 236 S.W.3d 302, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Texas Rule of Appellate Procedure 44.2(b) provides that an appellate court must disregard nonconstitutional error that does not affect a criminal defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). An appellate court may not reverse for nonconstitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not have a substantial and injurious effect or influence in determining the

21

jury's verdict. *See Casey*, 215 S.W.3d at 885 (citing *Garcia v. State*, 126 S.W.3d 921, 927 & n.9 (Tex. Crim. App. 2004)).

The Game Warden testified that he observed two aluminum beer bottles and an ice chest in the back of the boat, Kronenthal admitted to having drunk "like one beer[,]" and the Game Warden thought Kronenthal's indefinite response was odd. The Game Warden also noticed that Kronenthal's eyes were bloodshot, watery, and red. In addition, the Game Warden believed that Kronenthal had difficulty thinking and following instructions. The video exhibits were also published to the jury. A blood alcohol sample was obtained pursuant to a warrant, and the results of the analysis of the blood alcohol sample were admitted at trial and showed "0.121 (+/- 0.006) grams of alcohol per 100 milliliters of blood[.]"[3]

Based on our review of the entire record, we have fair assurance that any error in the admission of the Game Warden's testimony about the field sobriety tests did not affect Appellant's substantial rights and did not have a substantial and injurious effect or influence in determining the jury's verdict. *See id.* We also presume the omitted portions of the reporter's record are relevant and support the trial court's judgment. *See Zavala*, 498 S.W.3d at 642; *Burks*, 904 S.W.2d at 210. We overrule the second issue.

---

[3] Appellant does not challenge the blood draw warrant or analysis of the blood sample on appeal.)

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 26, 2020
Opinion Delivered September 30, 2020
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.